Strafford
No. 2008-458

THE STATE OF NEW HAMPSHIRE

v.

LEE RUSSELL

Argued: September 10, 2009
Opinion Issued: December 16, 2009

*Kelly A. Ayotte*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Stephanie Hausman*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Lee Russell, was convicted of armed robbery and reckless conduct, *see* RSA 636:3, III (2007); RSA 631:3 (2007), following a jury trial in the Superior Court (*Brown*, J.). On appeal, he argues that: (1) the trial court erred when it admitted evidence of his threatening statements pursuant to New Hampshire Rule of Evidence 404(b); and (2) the trial court committed plain error when it sentenced him to an extended term of imprisonment. We affirm.

The jury could have found the following facts. On November 14, 2006, the defendant; his cousin, Jenika Senter; Vincent Cooper; Cooper's girlfriend, Kimberly Dick; and Walter George were at Cooper and Dick's apartment in Rochester. The defendant, Senter, Cooper and George discussed "wanting to rob somebody." At 6:40 p.m., Senter used the defendant's cell phone to contact Travis Baker to purchase cocaine, but Baker told Senter that he could not sell her cocaine at that time.

Between 11:03 p.m. and shortly after midnight, Senter and Baker spoke many times. Shortly after midnight, Baker told Senter that he could get her three grams. Senter and Baker agreed to meet on Adele Drive in Dover. Baker and his girlfriend, Laura Sabine, drove to the arranged meeting place. Senter walked up to Baker's vehicle and got into the back seat. Senter said that she needed to get her purse out of her uncle's car, so Baker began to drive slowly down Adele Drive.

A young white male, approximately five feet ten inches to six feet tall, wearing a black hooded sweatshirt, suddenly appeared at the front passenger side window. The man had a tattoo on his face or neck. Baker testified that he saw the man's eyes and the bottom part of his face and neck, and Sabine testified that she saw the man's eyes, cheekbones and forehead. The man had a small, revolver-style gun and told the occupants of the car to give him everything they had. Baker refused and sped off. A .22 caliber bullet shattered the back window, ricocheted off the front windshield, and lodged in the dashboard. Senter laughed and told Baker to drive further down Adele Drive, but when Baker reached the end of the road, it was blocked by cars. Baker panicked and went back up Adele Drive. As they reached the spot where the shooting had occurred, Senter told Baker to stop the car and let her out. Baker refused and drove to Rochester, where, eventually, he let Senter out. Senter called Cooper to pick her up, and he took her to his apartment. Dick drove Senter home to Berwick, Maine. During the drive, Senter told Dick that the defendant had shot a gun at them. Baker and Sabine called 911 and went to the Dover Police Department, where they told the police what had happened.

The next morning, Detective Lance Watkinson of the Dover Police Department interviewed Senter at her home. Although at first Senter denied being at Adele Drive, she later admitted that she was there, described what had happened, and identified the defendant as the gunman. Her version of what had happened was consistent with Baker and Sabine's story. Later that day, Baker and Sabine viewed photographic lineups containing the defendant's photograph and, although neither had ever seen the defendant before, both identified the defendant as the person who looked most like the gunman.

Shortly after 5:00 p.m. on November 16, Detective Watkinson saw the defendant walking on Adele Drive. Detective Watkinson called the defendant's name, but he kept walking. The second time Detective Watkinson called the defendant's name, he looked at Detective Watkinson and then kept walking towards a car with his hands in the pocket of his sweatshirt. Detective Watkinson pulled out his gun, pointed it at the defendant, and ordered him to take his hands out of his pocket. The defendant complied and Detective Watkinson arrested him.

After his arrest, the defendant was held at the Strafford County House of Corrections. Some of his telephone calls were recorded. On December 2, 2006, the defendant had a conversation with his mother, Kathryn Smart, in which he said: "[Senter] says she's not f__ snitching. We'll f__ find out when we go to Court. If she's f__ telling . . . ." The defendant also said: "I've, I've got people, I've got, just cause I'm in here doesn't mean s__ can't be done. I don't give a f__." The defendant's mother commented that Senter had "done this to so many people" that it would all "catch up to her." She also said, "See what she's got to say when she's cross examined."

On December 4, 2006, Detective Watkinson testified at a probable cause hearing that Senter had identified the defendant as the gunman. The defendant's mother, his friends, and other family members attended the hearing. A few hours later, Senter contacted Detective Watkinson, upset that people were saying that Detective Watkinson had testified that she had identified the defendant because she never had. Senter went to the Dover Police Department with her father and grandmother and gave a videotaped statement in which she stated that she did not identify the defendant as the gunman and that the defendant was not the gunman. Before Detective Watkinson took Senter's statement, he played for her the recordings of the phone conversations between the defendant and his mother.

On December 8, 2006, the defendant and his mother had a telephone conversation in which they discussed someone named "Katie," who was not otherwise involved. The defendant's mother noted that "Katie's pretty pissed off . . . [w]ith . . . what happened to [the defendant]." The defendant stated that "[w]e should have [Katie] f__ up Jen . . . [s]he's a f__ bulldog." The defendant's mother responded, "I'm not saying nothing" and "I already know what she said she's gonna do. She's already on it." The defendant described Katie as "crazy" and his mother responded, "[It's] because you are too."

On December 10, 2006, the defendant and his mother had another conversation in which his mother said that if Baker and Senter "don't show up to Court, the case is thrown." The defendant agreed, and his mother responded, "Well I can't wait to see [Senter] show up, I mean that's gonna

be quite the interesting case." The defendant replied that he was "gonna try to stare at her the whole time. I'm . . . just gonna like stare both of them down. [Baker] and [Senter]."

On January 18, 2007, Senter testified before the Strafford County Grand Jury that she never identified the defendant. She stated that she had been threatened: "I have had threats saying that I am going to be shot, I am going to be dead . . . my father's car had $2,000 worth of vandalism done to it and my grandmother's as well." She also testified that she had received threats on her cell phone and MySpace page. Senter stated that she did not know who was threatening her, but stated "that is exactly why I did not want to call the police. This is exactly why I did not want to get involved because I am going to lose my life either way."

Before the defendant's trial, the State moved *in limine* to cross-examine the defendant's mother and Senter at trial with some of the telephone calls made by the defendant while he was in the Strafford County House of Corrections, and offer the conversations as substantive evidence of Senter and the defendant's mother's credibility and the defendant's consciousness of guilt.

The trial court ruled that the State could cross-examine Senter about whether the defendant had threatened her because that evidence was probative of her credibility and motive to lie. The State could question the defendant's mother about the defendant's threats because they were admissions and probative of his consciousness of guilt. If his mother testified inconsistently with her prior statements, the State could admit the telephone conversations "for the limited purpose of witness credibility." The trial court ruled that it would provide a limiting instruction that the defendant's mother's "conversations with the defendant [would] be considered for the limited purpose of her credibility with the exception of her testimony as to any threats by the defendant against . . . Senter." Finally, the trial court ruled that the telephone calls were admissible substantively as evidence of the defendant's consciousness of guilt, but ordered the State to redact certain portions of them.

Detective Watkinson testified at trial that Senter identified the defendant as the gunman when he interviewed her on November 16. Senter testified that the defendant was not the gunman and that she had never identified him as such. Specifically, she testified that the defendant went home before she walked to Adele Drive to meet Baker and Sabine. Senter claimed that she had received threats since the incident, although she did not attribute them to the defendant. Counsel for the defendant cross-examined Senter with evidence that she had heard parts of the audio recordings of the conversations between the defendant and his mother.

The defendant's mother testified that at the time of the robbery the defendant lived with her in her apartment in Dover. She stated that on the night of the robbery she returned to her apartment "roughly after 9:30" and that the defendant came home approximately ten to fifteen minutes later. She claimed that the defendant and his younger brother then played a video game and that she went to bed at approximately 10:45 p.m. She testified that she woke at approximately 1:00 a.m., went into the defendant's room to turn off his television, and saw him sleeping there. The State cross-examined the defendant's mother with portions of the telephone calls to impeach her testimony. After the jury convicted the defendant on both counts, the trial court imposed an enhanced sentence pursuant to RSA 651:2, II-g (2007).

## I. The Threats

### A. Senter's credibility

We first consider the defendant's argument that the trial court erred by admitting the three telephone calls pursuant to Rule 404(b). The defendant first argues that the threats were only minimally probative of Senter's credibility: (1) because Senter exonerated the defendant before she learned of the threats; and (2) because the State presented other evidence that Senter was afraid to testify so that the threats were cumulative.

The State counters that Senter's credibility was a central issue at trial and evidence that the defendant threatened her was highly probative of her credibility. Specifically, the State argues that it is reasonable to infer that Senter recanted after the probable cause hearing, and continued to deny that she had ever identified the defendant, after being threatened by the defendant and his family. The State contends that Senter impeached her own credibility, and that the threats were relevant to rebut Senter's claim that Detective Watkinson lied when he testified at trial that Senter identified the defendant. The State also maintains that the threats were probative of Senter's motive to continue to deny that she ever identified the defendant.

Although "[e]vidence of other crimes, wrongs or acts" is inadmissible "to prove the character of a person in order to show that the person acted in conformity therewith," such evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." N.H. R. Ev. 404(b). Accordingly, Rule 404(b) ensures "that the defendant is tried on the merits of the crime as charged and to prevent a conviction based upon evidence of other crimes or wrongs." *State v. Cook*, 158 N.H. 708, 711 (2009). "We

review the trial court's ruling for an unsustainable exercise of discretion, and will reverse only if it was clearly untenable or unreasonable to the prejudice of the defendant's case." *Id.* at 712. Because the trial court ruled on the admissibility of the threats in a pretrial motion, "we consider only what was presented at the pretrial hearing." *State v. Glodgett*, 144 N.H. 687, 694 (2000) (quotations omitted).

■ To be admissible under Rule 404(b): "(1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof that the defendant committed the act; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice to the defendant." *State v. Costello*, 159 N.H. 113, 118 (2009). The State must prove the admissibility of the bad acts. *Id.* Here, the defendant challenges the trial court's decision only under the first and third prongs of the Rule 404(b) analysis.

■ "To meet its burden under the first prong, the State must demonstrate the relevancy of the evidence." *Id.* Therefore, the State must "articulate the precise chain of reasoning by which the offered evidence will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity." *Id.* (quotations omitted). "That chain of reasoning must demonstrate a sufficient logical connection between the . . . acts and the permissible purpose for which the State offers the evidence." *Id.* (quotations omitted). "[F]or subsequent bad act evidence to satisfy the relevancy prong of our three-pronged test, the act must be fairly close in time and in some significant way connected to material events constituting the crime[s] charged." *State v. Richardson*, 138 N.H. 162, 167 (1993).

The trial court ruled that the State could cross-examine Senter "as to whether she received threats from the defendant," because the threats were probative of her credibility and motive to lie. The trial court further instructed the jury that "[a] witness may be examined on the issue of his or her credibility, and any reasons a witness may have for testifying inconsistently with earlier statements, including statements to the police." The trial court instructed that if the jury found "that . . . Senter knew about the threats made against her by the Defendant," it could "infer that this caused her to testify at trial in a manner that was inconsistent with earlier statements she gave to police officers who investigated this matter."

■ Senter's alibi testimony and credibility were critical given that the identity of the gunman was hotly contested at trial. *See State v. Beltran*, 153 N.H. 643, 649-50 (2006). When Detective Watkinson met with Senter on December 4, he played portions of the telephone conversations in which the

defendant threatened Senter. Therefore, those threats were probative of Senter's motive to continue to deny that she ever identified the defendant as the gunman. *See id.* at 648-49 (evidence of defendant's abuse of victim probative of victim's credibility and motive to lie to police); *State v. Duff*, 129 N.H. 731, 734 (1987) (defendant's threats to and abuse of alibi witness "highly relevant to the alibi witness' credibility" as they could have led witness to corroborate defendant's story for fear of future harassment).

■ Moreover, the threats were not cumulative. Evidence that Senter had received threats on her cell phone and the internet and that her grandmother's and father's cars had been vandalized was probative of her fear of testifying. However, Senter testified that she did not know where those threats came from, and denied that the defendant was behind those threats. Evidence that Detective Watkinson played the recording of the defendant's threats for Senter established a link between the defendant's threats and Senter's motive to continue to deny that she had ever identified the defendant. *See State v. Davis*, 143 N.H. 8, 12 (1998) (cumulative evidence is "additional evidence of the same kind to the same point" (quotations omitted)). Thus, the defendant has failed to demonstrate that the trial court erroneously admitted the threats under the first prong of the Rule 404(b) analysis.

Under the third prong, the defendant argues that the prejudicial effect of the threats outweighs their minimal probative value. Specifically, he argues that they are highly prejudicial because: (1) they were violent threats against his cousin, a teen-aged girl; (2) they are similar to the charged acts because the threats and the charged acts are both violent; and (3) he used vulgar language in the telephone calls. The defendant also argues that the calls contain prejudicial statements that have no probative value, specifically pointing to his statement that "Katie" is "crazy" and his mother's response that the defendant is as well.

The State counters that the threats were only minimally prejudicial, given that: (1) the trial court admitted redacted versions of only three telephone calls; (2) the threats and vulgar language were not so inflammatory that they would provoke juror outrage and render the threats unfairly prejudicial; (3) the threats were not so similar to the shooting as to render them inadmissible; and (4) the trial court instructed the jury that it could consider the threats as they were probative of Senter's credibility. The State also argues that the defendant's comment about "Katie" and his mother's reply were not unduly prejudicial and were probative of how far the defendant was willing to go to pressure Senter. Alternatively, the State argues that the threats did not prejudice the defendant and that their admission was harmless beyond a reasonable doubt.

■ Under the third prong of Rule 404(b), evidence of bad acts "is admissible if the danger of unfair prejudice to the defendant does not substantially outweigh the probative value of the evidence." *Beltran*, 153 N.H. at 649. "Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, or provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision upon something other than the established propositions in the case." *Id.* "It is not, however, evidence that is merely detrimental to the defendant because it tends to prove his guilt." *Id.* "Among the factors we consider in weighing the evidence are: (1) whether the evidence would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; and (3) the extent to which the issue upon which it is offered is established by other evidence, stipulation or inference." *Costello*, 159 N.H. at 123.

■ "We accord considerable deference to the trial court's determination in balancing prejudice and probative worth under Rule 404(b)." *Beltran*, 153 N.H. at 649. "To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Id.* "Particularly pertinent to determining this balance is whether the evidence is relevant to prove an issue that is actually in serious dispute." *State v. Pepin*, 156 N.H. 269, 278-79 (2007).

■■ "First, we consider the probative value of the evidence." *State v. Kim*, 153 N.H. 322, 330 (2006). "When evidence presents a potential for prejudice, such evidence must possess significantly greater probative value." *Id.* at 331. As discussed above, the defendant's threats were highly probative of Senter's credibility — specifically, her motive to continue to deny that she had ever identified the defendant. Senter's testimony was crucial to the determination of the defendant's guilt or innocence, given that the shooter's identity was the crucial issue at trial. *See Beltran*, 153 N.H. at 649-50. Although the threats were inflammatory, given that the defendant used vulgar language to threaten his teen-aged cousin, we cannot conclude that the evidence "was so inflammatory as to substantially outweigh its probative value." *Costello*, 159 N.H. at 123. The threats were unlikely to appeal to juror resentment or outrage.

■ As "[u]nfair prejudice is inherent in evidence of other similar crimes or prior convictions," *Beltran*, 153 N.H. at 649 (quotation omitted), "[t]he degree of prejudice may depend upon the similarity of the other incident to that for which the defendant is currently on trial." *Id.* Although the threats were violent, as was the charged conduct, they are "not sufficiently similar as to increase the degree of prejudice on that basis." *Id.* "[T]he similarity

argued by the defendant is too tenuous in nature to warrant exclusion of the evidence of [the threats]." *Id*. Accordingly, we conclude that the defendant has failed to prove that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case.

### B. Smart's credibility

Next, the defendant contends that the trial court erred in admitting his threats as probative of his mother's credibility under the first prong of the Rule 404(b) analysis. The State argued that the threats were probative of his mother's credibility because his mother knew and approved of the threats and discussed the possibility that Senter would be harmed. The defendant contends that, assuming that his mother condoned his threats, the State failed to articulate how that evidence would be probative of his mother's credibility without relying upon propensity-based inferences. The State counters that the threats were probative of the defendant's mother's bias and motive to lie. The State argues that Smart's alibi testimony was crucial to the determination of the defendant's guilt or innocence, so that her credibility was critical.

The trial court ruled that the State could question the defendant's mother about the defendant's threats, finding that "[t]he statements made by the defendant are admissions, and are admissible as evidence." If she testified inconsistently with her prior statements, the trial court ruled that the State could "introduce the telephone conversations for the limited purpose of witness credibility." The trial court instructed the jury that it could consider the defendant's conversations with his mother to "determine [her] credibility, and whether she has any bias or relationship or animosity towards individuals involved in this case that may have influenced her testimony at trial."

Prior to trial, the defendant filed a Notice of Alibi, representing that his mother would testify that he was home the night of the shooting. His mother testified that at the time of the robbery, the defendant lived with her, that he returned to her apartment the night of the robbery at around 9:45 p.m., and that when she woke at approximately 1:00 a.m., she saw the defendant in his room sleeping. Like Senter's testimony, the defendant's mother's alibi testimony and credibility were critical given that the identity of the shooter was the contested issue at trial. *See Beltran*, 153 N.H. at 649-50. Her conversations with her son were probative of her bias and motive to lie about his whereabouts on the night of the shooting. During the three conversations admitted into evidence, the defendant threatened Senter. His mother listened to the threats and did not discourage him, she discussed "Katie" taking violent action against Senter, noted that, if Senter

did not testify, the case would be "thrown," and commented that she could not wait to see Senter at trial because that would "be quite the interesting case."

The defendant also argues that the prejudicial effect of these statements substantially outweighs their minimal probative value under the third prong of the Rule 404(b) analysis. For the reasons described above in our discussion of the threats in relation to Senter's credibility, we find that the defendant has failed to prove that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case.

### C. Consciousness of Guilt

Finally, the defendant argues that, because the threats were only minimally probative of his consciousness of guilt, the trial court erroneously admitted them under the first prong of the Rule 404(b) analysis. Specifically, he argues that: (1) instead of shedding light on his consciousness of guilt, the threats imply that he was upset at Senter's false accusations; (2) the threats reveal his interest in trial developments, not his desire to exclude evidence or communicate to Senter that she would be harmed if she testified; (3) because evidence of his refusal to stop when arrested by Detective Watkinson was more probative of his consciousness of guilt than the threats, the threats were inadmissible; and (4) the December 10 telephone call had no probative value because it contained no threats. The State counters that the threats were probative of the defendant's consciousness of guilt and demonstrated his knowledge and fear of Senter's damaging statements.

The trial court ruled that the defendant's threats were admissions and were therefore admissible. The trial court also ruled that the threatening statements were admissible substantively as they were probative of the defendant's consciousness of guilt. The trial court instructed the jury that the threats against Senter could be considered "as substantive evidence of the Defendant's guilt," that "[t]hreats against a witness made or adopted by a defendant, which indicate a desire to exclude the witness's testimony or other evidence at trial may indicate a guilty frame of mind," and if the jury found that "the Defendant made threats against . . . Senter and that [the] threats indicate that he had a desire to prevent her from testifying at trial," it could "consider it as substantive evidence of the Defendant's guilt." The trial court instructed the jury that Senter's knowledge of the threats, or lack thereof, was irrelevant because the threats pertained to the defendant's state of mind.

■■ ■ "Evidence of threats to witnesses can be relevant to show consciousness of guilt." *United States v. Monahan*, 633 F.2d 984, 985 (1st Cir. 1980); *see State v. Edwards*, 644 S.E.2d 66, 70-71 (S.C. Ct. App. 2007)

(collecting cases), *aff'd as modified by*, 678 S.E.2d 405 (S.C. 2009); *State v. Belkner*, 117 N.H. 462, 468-69 (1977) (upholding trial court's admission of defendant's threats against witness where defendant conceded that such threats were admissible against defendant). The defendant threatened Senter during each of the three telephone calls admitted at trial. These threats are probative of his consciousness of guilt. *See Monahan*, 633 F.2d at 985; *Belkner*, 117 N.H. at 468-69.

The defendant's argument that his statements imply that he was angry at Senter's false accusations is unpersuasive. During the December 2 telephone call, the defendant stated that Senter "says she's not f__ snitching." He further stated that "[w]e'll f__ find out when we go to Court. If she's f__ telling." To "snitch" is "to give incriminating evidence against someone, esp. an associate." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2157 (unabridged ed. 2002); *see also Henry v. Chapa*, No. 1:07-CV-00336-DGC, 2009 WL 1748697, at *4 (E.D. Cal. June 19, 2009) (describing informing on other inmate as "substantially comply[ing] with the definition of the word 'snitch' "). A "snitch" is an "informer [or] stool pigeon." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2157 (unabridged ed. 2002). The defendant's statements about Senter "snitching" are probative of his consciousness of guilt. *See Mannino v. Graham*, No. 06 CV 6371 (ARR), 2009 WL 2058791, at *7 (E.D.N.Y. July 15, 2009) (evidence of defendant's assault on cooperating witness plus defendant's references to witness's statements and description of witness as "snitch" admissible as threat against key trial witness demonstrating consciousness of guilt); *Larry v. State*, 716 N.E.2d 79, 81 (Ind. Ct. App. 1999) (evidence that defendant called co-defendant a "snitch" and beat co-defendant up admissible under Rule 404(b) to prove defendant's consciousness of guilt regarding the charged crime).

Evidence that the defendant did not immediately stop before being arrested does not minimize the probative value of his threats. The State introduced this evidence on the second day of trial, "well after the trial court rendered its pre-trial ruling, and the defendant makes no suggestion that he asked the trial court to reconsider its ruling in light of " the admission of the evidence. *State v. Hebert*, 158 N.H. 306, 312 (2009) (analysis of admission of conviction under New Hampshire Rule of Evidence 609(a)). As the defendant contested the identity of the robber, his consciousness of guilt remained at issue throughout the trial. *See id.*

Moreover, the defendant threatened Senter during the third telephone call. During that call, the defendant stated that, during trial, he was "gonna try to stare at [Senter] the whole time. I'm, I'm just gonna like stare both of them down. [Baker] and [Senter]." We disagree that the threats do not demonstrate a desire to exclude pertinent evidence at trial. The defendant

implied that he could use other people to harm Senter, suggested that he and his mother have Katie "f__ up Jen," and told his mother that he would stare at Senter "the whole time" during trial, and that he would stare her down.

The defendant also argues that the prejudicial effect of his threats substantially outweighs their minimal probative value. For the reasons described above, we find that the defendant has failed to prove that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case.

 Finally, the defendant argues that the trial court's instructions did not explicitly prevent the jury from considering the threats as evidence of his bad character. The State maintains that the defendant never submitted proposed instructions, requested contemporaneous limiting instructions, or objected to the trial court's limiting instructions. Because the defendant did not object to the trial court's jury instructions, we do not reach the merits of his argument. *See State v. Small*, 150 N.H. 457, 464 (2004).

## II. Legality of the Sentence

Next, we consider the defendant's argument that the trial court violated his due process rights under the Fifth Amendment to the Federal Constitution and Part I, Article 15 of the State Constitution when it sentenced him to an extended term under RSA 651:2, II-g because the court did not instruct the jury that it must unanimously conclude that he used a firearm during the armed robbery. Specifically, the defendant argues that, based upon the jury instructions and evidence presented at trial, the jury could have convicted him of armed robbery with a BB gun. Although the defendant concedes that he did not object to the trial court's jury instructions or to the imposition of the enhanced sentence, the defendant contends that we should review his sentence under the plain error rule. *See* SUP. CT. R. 16-A.

 Under the plain error rule, we may consider errors not raised before the trial court. *State v. Matey*, 153 N.H. 263, 266 (2006). "A plain error that affects substantial rights may be considered even though it was not brought to the attention of the trial court or the supreme court." SUP. CT. R. 16-A. "However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." *Matey*, 153 N.H. at 266 (brackets and quotations omitted). To find plain error: "(1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* We have

looked to federal plain error analysis for guidance in applying our plain error rule. *See State v. Lamy*, 158 N.H. 511, 524 (2009); *State v. Panarello*, 157 N.H. 204, 207 (2008).

The State concedes that the trial court erred, and that the error was plain. We agree. The defendant was not eligible for an enhanced sentence under RSA 651:2, II-g unless he was "convicted of a felony, an element of which is the possession, use or attempted use of a firearm." *State v. Henderson*, 154 N.H. 95, 98 (2006). Further, RSA 651:2, II-g does not apply "[a]bsent a specific finding by the jury that an element of the felony for which it convicted the defendant was possession, use or attempted use of a firearm." *Id.* The trial court instructed the jury that the defendant was charged with one count of armed robbery with a firearm and one count of reckless conduct with a firearm. With respect to the armed robbery charge, the trial court instructed the jury that it had to find unanimously beyond a reasonable doubt that "the defendant was actually armed with a deadly weapon," and defined "deadly weapon" as including "any firearm, knife or anything else which is used in such a way that the defendant knew or should have known that it could result in death or serious bodily injury." However, the trial court did not instruct the jury that it had to find that the deadly weapon that the defendant used during the robbery was a firearm. *See Henderson*, 154 N.H. at 98; *see also State v. Higgins*, 149 N.H. 290, 300 (2003) (*Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000), requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proven beyond a reasonable doubt").

We next consider whether, under the third prong of plain error review, the trial court's error affected substantial rights. In *State v. Kousounadis*, we held that, under the State Constitution, "a jury instruction that omits an element of the offense charged is an error that partially or completely den[ies] a defendant the right to the basic trial process" and is therefore a structural error "not subject to harmless error analysis." *State v. Kousounadis*, 159 N.H. 413, 429 (2009) (quotations and citation omitted). Under plain error review, at least one court has concluded that structural errors satisfy both the third and fourth prongs of plain error analysis. *See United States v. Vazquez*, 271 F.3d 93, 103 (3d Cir. 2001) (but concluding that *Apprendi* errors are not structural errors); *see also United States v. Rodriguez*, 406 F.3d 1261, 1266 (11th Cir. 2005) (noting that "no court has ever actually held that an error is structural but fails to meet the fourth prong of the plain error test"). *But see United States v. Padilla*, 415 F.3d 211, 220 (1st Cir. 2005) (structural errors are subject to plain error review). Other courts have determined that structural errors automatically

satisfy the third prong of plain error review. *United States v. Recio*, 371 F.3d 1093, 1101 (9th Cir. 2004) (citing cases).

However, the United States Supreme Court has repeatedly declined to determine whether structural errors automatically satisfy the third prong under the federal plain error analysis. *See Puckett v. United States*, 129 S. Ct. 1423, 1432 (2009). The Supreme Court has declined to decide whether the failure to submit the element of materiality to the jury in a perjury prosecution is structural, *see Johnson v. United States*, 520 U.S. 461, 463 (1997), and whether the failure to charge an element of a crime pursuant to the *Apprendi* federal indictment requirement is structural, *see United States v. Cotton*, 535 U.S. 625, 632-34 (2002). Instead, in *Cotton* and *Johnson*, the United States Supreme Court assumed without deciding that those errors satisfied the third prong of plain error review. *See Johnson*, 520 U.S. at 467; *Cotton*, 535 U.S. at 632-33. Like the United States Supreme Court, we will assume without deciding that the trial court's error affected the defendant's substantial rights, under the third prong of our plain error analysis. *See Johnson*, 520 U.S. at 469; *Cotton*, 535 U.S. at 632-33.

■■■ We next consider whether the fourth prong has been satisfied. Under the fourth prong, we must decide whether the trial court's error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Matey*, 153 N.H. at 266. The State argues that the trial court's error did not satisfy the fourth prong because the jury clearly unanimously concluded that the defendant used a firearm to commit the charged offenses. The United States Supreme Court has emphasized that, under the fourth prong, an appellate court has "the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Puckett*, 129 S. Ct. at 1429 (brackets omitted); *see United States v. Olano*, 507 U.S. 725, 735 (1993). "The fourth prong is meant to be applied on a case-specific and fact-intensive basis." *Puckett*, 129 S. Ct. at 1433; *see also United States v. Young*, 470 U.S. 1, 16 (1985) ("Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record."). Accordingly, "[m]eeting all four prongs is difficult, as it should be." *Puckett*, 129 S. Ct. at 1429 (quotations omitted).

■■■ In *Johnson* and *Cotton*, the Supreme Court determined that, because evidence supporting materiality and the uncharged element, respectively, was "overwhelming" and "essentially uncontroverted," there was "no basis for concluding that the error[s] seriously affected the fairness, integrity or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 470 (quotations and brackets omitted); *see Cotton*, 535 U.S. at

632-33. Similarly, here, the evidence presented at trial that the defendant used a firearm to commit the charged offenses was overwhelming. Although Baker testified that he initially thought that the shooter had a BB gun and that he did not hear a shot when the rear window shattered, he also stated that the defendant pointed a gun at Sabine. Baker testified that he thought a BB gun would not do that much damage to the window, and that the gun looked like a revolver, an older gun like the "type of guns cowboys used." Senter testified that someone had stuck a gun inside Baker's vehicle and shot out its back window. The crime scene technician testified that he found a metal fragment in the dashboard that "appeared to be a bullet." The firearms expert testified that the fragment was from "a discharged bullet," and that it had copper washing on it, which "typically, only .22 caliber bullets have [the] copper washing."

Moreover, at trial, the defendant did not dispute that the deadly weapon used during the robbery was a firearm. The State argued throughout trial that the defendant had used a firearm or handgun to commit both of the charged offenses. During opening statements, the prosecutor argued that a fragment of a bullet had been found in Baker's vehicle, and counsel for the defendant stated that "everything about this case is going to be identification" and asked the jury to determine "who stuck the gun in the car and threatened and then shot?" At the close of the State's case, counsel for the defendant argued that the State had failed to prove that the defendant was the gunman or "trigger man," but did not argue that the State had failed to prove that the gunman had used a firearm.

Accordingly, we decline to exercise our discretion under the fourth prong of our plain error rule to reverse the conviction and sentence. *See Johnson*, 520 U.S. at 470; *Cotton*, 535 U.S. at 632-33; *United States v. Vazquez*, 271 F.3d at 106 (collecting cases and noting that several other circuit courts had considered evidence adduced at trial and denied relief for *Apprendi* violations where evidence was conclusive); *United States v. Sifuentes*, 30 Fed. Appx. 555, 561 (6th Cir. 2002). Given the overwhelming and essentially uncontroverted evidence that the defendant used a firearm to commit the armed robbery, "the real threat then to the fairness, integrity, and public reputation of judicial proceedings would be if [the defendant], despite the overwhelming and uncontroverted evidence that [he used a firearm], were" not to receive the enhanced sentence. *Cotton*, 535 U.S. at 634.

The defendant argues that, based on our decisions in *State v. Taylor*, 152 N.H. 719, 720 (2005), and *State v. Henderson*, 154 N.H. 95, 96 (2006), the trial court's error satisfies the final two prongs of the plain error rule. We disagree. In *Taylor*, the defendant was convicted of two counts of felon in possession, contrary to RSA 159:3, where the indictments alleged that he had "firearms under his control." *Taylor*, 152 N.H. at 721. The trial court

sentenced the defendant under the enhanced sentencing provision of RSA 651:2, II-g, which applies, in relevant part, "if a person is convicted of a felony, an element of which is the possession . . . of a deadly weapon, and the deadly weapon is a firearm." *Id.* at 720. Under "the plain language of RSA 159:3, the words 'under his control' and 'in his possession' have independent meanings," and RSA 651:2, II-g "applies to the possession . . . of a firearm." *Id.* at 721. We concluded that the trial court erroneously applied RSA 651:2, II-g because the indictments alleged that the defendant had firearms under his control. *Id.* A finding that the defendant had firearms under his control could not trigger a sentence under RSA 651:2, II-g. *Id.* Thus, the trial court lacked the statutory authority to sentence the defendant pursuant to the enhancement provisions of RSA 651:2, II-g. *See id.* As a result, we exercised our discretion to conclude that the sentence "seriously affect[ed] the fairness, integrity [and] public reputation of judicial proceedings." *Matey*, 153 N.H. at 266; *see Taylor*, 152 N.H. at 721.

Similarly, in *Henderson*, the defendant was charged with having a firearm in his possession or under his control. *Henderson*, 154 N.H. at 97. Focusing solely on an instruction that the jury could convict the defendant of felon in possession if the State proved that the defendant "owned or had in his possession or under his control a firearm," we reasoned that there was a high risk that the jury did not convict the defendant of possession of a firearm, a prerequisite to the application of RSA 651:2, II-g. *See id.* at 97-98 (quotations omitted). We therefore concluded that the trial court erroneously sentenced the defendant pursuant to RSA 651:2, II-g. *Id.* at 98. By contrast, here, the jury instructions were unambiguous, and there was no risk that the jury would convict the defendant of possession of a BB gun, an element that would not support the imposition of an enhanced sentence under RSA 651:2, II-g. As noted above, evidence that the defendant used a firearm was overwhelming and not disputed.

Finally, our decision is consistent with our harmless error analysis in *State v. Kousounadis*. Unlike plain error review, which "is an exception to the contemporaneous objection rule [that] provides us with the discretion to review unpreserved error on appeal for plain error that affects substantial rights," *Hebert*, 158 N.H. at 314, harmless error review generally "applies to *all* errors where a proper objection is made." *Neder v. United States*, 527 U.S. 1, 7 (1999). As noted above, in *Kousounadis*, we held that the harmless error rule is inapplicable because the failure to instruct a jury on an element of the offense is structural error. *Kousounadis*, 159 N.H. at 428-29. There is some authority that supports the conclusion that structural errors satisfy the third and fourth prongs of the plain error rule. *See United States v. Rodriguez*, 406 F.3d at 1266;

*United States v. Recio*, 371 F.3d at 1101; *United States v. Vazquez*, 271 F.3d at 103. This analysis, however, appears to conflict with the Supreme Court's most recent plain error opinion, which "emphasize[s] that a *per se* approach to plain-error review is flawed." *Puckett*, 129 S. Ct. at 1433 (quotation omitted).

Moreover, holding that the failure to instruct the jury on an element of the offense always constitutes plain error would create a windfall for criminal defendants. Under such a holding, a defendant would have no reason to object and every incentive not to object. The plain error rule is not designed to reward such an outcome. *See Johnson*, 520 U.S. at 470 ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." (quotation omitted)).

*Affirmed.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.