NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Rockingham
No. 2014-0591

THE STATE OF NEW HAMPSHIRE

v.

ROLAND DOW

Argued: September 16, 2015
Opinion Issued: January 12, 2016

Joseph A. Foster, attorney general (Heather A. Cherniske, attorney, on the brief and orally), for the State.

Wilson, Bush, Durkin & Keefe, P.C., of Nashua (Charles J. Keefe on the brief and orally), for the defendant.

CONBOY, J. The defendant, Roland Dow, appeals his convictions after a jury trial on two counts of first degree assault, one count of second degree assault, five counts of endangering the welfare of a child, two counts of witness tampering, and one count of unlawful interception and disclosure of oral communications or telecommunications. See RSA 631:1 (2007) (amended 2014); RSA 631:2 (Supp. 2012) (amended 2014); RSA 639:3 (2007); RSA 641:5 (2007); RSA 570-A:2 (Supp. 2015). On appeal, he argues that the Superior Court (Wageling, J.) erred by: (1) admitting detailed evidence that he physically abused his former girlfriend, Jessica Linscott; and (2) allowing the State's expert witness to testify regarding the effects of domestic violence on a victim. We affirm.

I.    Background

The pertinent facts are as follows.  In September 2012, Linscott and her three-year-old son, J.N., lived with the defendant in his home in Plaistow.  The defendant and Linscott were in a domestic relationship, but the defendant was not the father of J.N.

Both the defendant and Linscott repeatedly disciplined J.N. for certain behaviors.  If J.N. "had an accident or if he peed on the floor," the defendant made J.N. "clean it up" and would put him "in the shower and rinse him off." The defendant would spray water in J.N.'s face and J.N. "would fight back." When the defendant let go of J.N., J.N. would "flop all over the tub" and "slip and fall and smash his head."  The defendant would then yell at J.N. and put him back under the shower spray.  Linscott testified that "this happened many times" and each time it "continue[d] until [the defendant] decided to shut the shower off."  Sometimes Linscott put J.N. in the shower because she felt that if she "didn't do it . . ., when [the defendant] would do it, it would be worse."

The defendant also disciplined J.N. by having him run outside and by spanking him.  Linscott spanked J.N., too, "[b]ecause [she] thought [she] had to" and that if she did not do so, the defendant and Linscott would fight about it and the defendant "would do it, and it'd be a lot worse."  The defendant repeatedly told Linscott that "something was wrong" with J.N. and that he "had a mental problem and that he must have autism."  At first Linscott did not believe the defendant, but "the more [the defendant] told [her J.N.] was doing things wrong, the more [she] paid attention" and "believed that something was wrong with" J.N.

In November 2012, J.N. began "having seizures."  On one occasion, Linscott tried to call 911, but the defendant "ripped the phone out of [her] hand," telling her that she was an "idiot" because J.N. "had bruises all over him" and if she called 911 they would be arrested for abuse.  The defendant continued to treat J.N. the "same way as if [the seizures] weren't going on, because he thought [J.N.] was doing them to himself."  Linscott testified that, whenever J.N. had a seizure, the defendant "[y]ell[ed] at him, [told] him to stop doing that, and then hit him."

On November 14, after J.N. had been displaying the seizure-type behavior for three or four days, the defendant and Linscott brought him to the emergency room at Exeter Hospital.  Subsequently, J.N. was transported to Dartmouth-Hitchcock Medical Center in Lebanon because "he had fluid in . . . or around his brain."  At Dartmouth-Hitchcock, Linscott was questioned by staff from the hospital and the New Hampshire Division for Children, Youth and Families about abuse at home.  She did not "say anything" because she "didn't want to believe" that J.N.'s injuries were caused by the defendant. Linscott testified that a "part of [her] was scared to tell them" and "scared to

admit that it was going on." Linscott was also interviewed twice by the police and denied that the defendant had physically abused her or J.N.

Two days later, the defendant picked Linscott up at the hospital and they left New Hampshire. J.N. remained in the hospital. Shortly thereafter, the defendant and Linscott were arrested in Florida. At the time of her arrest, Linscott was photographed with what appeared to be a black eye. When interviewed by the police following her arrest, Linscott initially denied that the defendant abused her or J.N., but later reported that she sustained the black eye when the defendant struck her and described "things that had happened" at the home in Plaistow.

The defendant was charged with two counts of first degree assault alleging that, acting in concert with or aided by Linscott, he recklessly caused serious bodily injury to J.N., and two counts of second degree assault alleging that, acting in concert with or aided by Linscott, he knowingly caused certain bodily injury to J.N. He was also charged with five counts of endangering the welfare of a child for "failing to seek medical care for J.N. while J.N. was suffering seizures and/or other symptoms following a head injury," two counts of witness tampering, and one count of unlawful interception and disclosure of oral communications or telecommunications. At trial, Linscott provided detailed testimony regarding numerous instances in which the defendant physically abused her and J.N. At the close of the evidence, the defendant's counsel argued to the jury that Linscott was lying and that any abuse suffered by J.N. was caused by her.

The jury acquitted the defendant of one of the second degree assault charges, but convicted him on the remaining charges. This appeal followed.

## II. Linscott's Testimony Regarding Her Abuse by the Defendant

Before trial, the defendant sought to exclude, pursuant to New Hampshire Rule of Evidence 404(b), any evidence that he threatened or abused Linscott. The State objected, arguing that evidence of uncharged abuse of Linscott by the defendant was relevant to explain to the jury why Linscott did not report the abuse of J.N. and failed to disclose the abuse to the police. The State asserted that, because J.N. would not be testifying at trial, the jury would hear only Linscott's testimony and, therefore, her "credibility [was] pivotal in the State's case against the defendant."

After hearing offers of proof and arguments by counsel and reviewing transcripts and other documents submitted by the State, the trial court determined that the defendant's abuse of Linscott was relevant to explain her fear of the defendant and why she participated in the alleged acts, as well as why she lied to the police. The court further found that there was clear proof that the defendant committed threatening and abusive acts against Linscott.

Specifically, the court found that there was clear proof that the defendant "pulled . . . Linscott and dragged her to the stairs," and "then dropped her over the stairs and struck her in the face, requiring medical treatment." In addition, the court found that, "[o]n approximately eight occasions, [the defendant] strangled" Linscott and that he also "smashed her head against doors and walls," and "pulled out handfuls of her hair." It further found that, at one point, Linscott tried to call her mother and the defendant grabbed her "phone and broke it in half." The court found that, on one occasion, Linscott "had to push her way past" the defendant in order to leave and that the defendant told her "that if he ever found out she was talking with someone about their situation, he would kill her." Finally, the court found that the probative value of the evidence that the defendant abused Linscott was not substantially outweighed by its prejudice.

The defendant argues that the court erred by allowing Linscott to testify at trial concerning his abuse of her. He contends that admission of such evidence violated New Hampshire Rule of Evidence 404(b).

Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b). The purpose of Rule 404(b) is to ensure that the defendant is tried upon the merits of the crime as charged and to prevent a conviction based upon evidence of other crimes or wrongs. State v. Beltran, 153 N.H. 643, 647 (2006).

We review the trial court's ruling for an unsustainable exercise of discretion and will reverse only if the ruling was clearly untenable or unreasonable to the prejudice of the defendant's case. Id. Because the defendant appeals only the court's pretrial ruling on the admissibility of Linscott's testimony regarding her abuse by the defendant, and because the defendant has not demonstrated that he renewed his objection after Linscott testified at trial, "we consider only what was presented at the pretrial hearing." State v. Russell, 159 N.H. 475, 483 (2009) (quotation omitted); cf. State v. Smalley, 151 N.H. 193, 196 (2004) (trial evidence reviewed on appeal because defendant renewed his Rule 404(b) objection at the end of trial).

We have established a three-part test for the admissibility of evidence under Rule 404(b): (1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof

that the defendant committed the act; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice to the defendant. Beltran, 153 N.H. at 647. The State bears the burden of demonstrating the admissibility of such evidence. Id. Here, the defendant argues that the State failed to meet its burden, challenging the trial court's decision with respect to the first and third prongs of the Rule 404(b) analysis.

In order to meet its burden under the first prong, the State is required to specify the purpose for which the evidence is offered and articulate the precise chain of reasoning by which it will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity. Id. (emphasis added). "That chain of reasoning must demonstrate a sufficient logical connection between the acts and the permissible purpose for which the State offers the evidence." Russell, 159 N.H. at 483 (quotation and ellipsis omitted). Thus, for prior bad acts to be relevant, the acts must be in "some significant way connected to material events constituting the crime charged" and not so remote in time as to eliminate the nexus. Beltran, 153 N.H. at 647-48.

The defendant contends that our articulation of the relevance standard for admission of prior bad act evidence sets forth a higher standard than that required under New Hampshire Rule of Evidence 401, and that evidence of uncharged acts of domestic violence committed by him against Linscott did not meet this standard. We need not decide whether the relevance standard under Rule 404(b) is "higher" than that under Rule 401 because we conclude that the proffered evidence of the defendant's prior abuse of Linscott met the standard we have articulated for admission of prior bad act evidence under Rule 404(b).

There was a significant logical connection between the defendant's abuse of Linscott and her failure to report the abuse of J.N. and the reason she lied to the police. Because J.N. was not testifying at trial, Linscott's testimony regarding the defendant's abuse of J.N. was critical to the State's ability to prove the crimes charged against the defendant relating to J.N. Consequently, the defendant's abuse of Linscott was relevant for the non-propensity purpose of explaining her justifiable fear of the defendant that prompted her to delay reporting the defendant's abuse of J.N. and, later, to lie to the police. See Beltran, 153 N.H. at 648 (evidence of defendant's physical abuse of witness relevant to explain her submission to defendant's demands surrounding murders and her delay in reporting); cf. State v. Berry, 148 N.H. 88, 91 (2002) (evidence of defendant's physical abuse of victim relevant to explain her delayed reporting of sexual abuse); State v. Connor, 19 A.3d 146, 148-51 (Vt. 2011) (evidence of history of defendant's abusive conduct toward victim relevant to establish credible context for assault when victim delayed reporting assault to police). Thus, contrary to the defendant's contention, evidence of the

5

defendant's abuse of Linscott was in a significant way connected to material events constituting the crime charged. See Beltran, 153 N.H. at 647-48.

The defendant further argues that his abuse against Linscott was not in some significant way connected to material events constituting the crime charged because the State failed to establish that Linscott "engaged in any acts regarding [J.N.] because the [defendant] abused her." He maintains that "there was no evidence presented to the trial court that the abuse by [him] had any impact on [Linscott] in relation to [J.N.]." Specifically, he argues that there was no evidence that Linscott herself stated that she acted as she did out of fear of the defendant. The defendant, however, has failed to provide us with a transcript of the offer-of-proof hearing or with the other transcripts and documents relied upon by the court in making its ruling. Without the transcripts or documents, we cannot conclude that the court unsustainably exercised its discretion in ruling that the State had met its burden under the first prong of Rule 404(b). See State v. Hebert, 122 N.H. 1089, 1090 (1982) (concluding that, without transcript, we could not say that trial court abused its discretion in ruling on defendant's motion for return of property).

To the extent that the defendant relies upon Linscott's trial testimony to support his argument that there was no evidence that her actions in relation to the abuse of J.N. were caused by her fear of the defendant, we decline to consider such testimony. The defendant has appealed only the trial court's pretrial ruling and has not demonstrated that he renewed his objection to the evidence after Linscott testified at trial. Cf. Smalley, 151 N.H. at 196.

The defendant next argues that the court erred in its analysis under the third prong of Rule 404(b). Under the third prong, evidence of other, uncharged bad acts "is admissible if the danger of unfair prejudice to the defendant does not substantially outweigh the probative value of the evidence." Russell, 159 N.H. at 485 (quotation omitted). Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision upon something other than the established propositions in the case. Beltran, 153 N.H. at 649. It is not, however, evidence that is merely detrimental to the defendant because it tends to prove his guilt. Id. Among others, the factors we consider in weighing the evidence are: "(1) whether the evidence would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; and (3) the extent to which the issue upon which it is offered is established by other evidence, stipulation or inference." Russell, 159 N.H. at 485 (quotation omitted).

"We accord considerable deference to the trial court's determination in balancing prejudice and probative worth under Rule 404(b)." Id. (quotation omitted); see also State v. Tabaldi, 165 N.H. 306, 323 (2013) ("[W]e give the trial

6

court broad latitude when ruling on the admissibility of potentially unfairly prejudicial evidence." (quotation omitted)). "To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." Russell, 159 N.H. at 485 (quotation omitted). "Particularly pertinent to determining this balance is whether the evidence is relevant to prove an issue that is actually in serious dispute." Id. (quotation omitted).

"First, we consider the probative value of the evidence." Id. (quotation omitted). Determining the probative value of evidence entails analyzing how relevant it is. State v. Costello, 159 N.H. 113, 123 (2009). Here, as the trial court found, this evidence "has a strong tendency to explain that [Linscott] was afraid for her life," and to provide the jury with "a better context to understand her actions and evaluate her credibility."

The defendant contends that no matter what relevance this evidence may have had, it "was greatly outweighed by the danger of unfair prejudice." He maintains that evidence of prior abuse committed by him against Linscott was "unfairly prejudicial . . . [d]ue to the similar nature of the charged and uncharged conduct." He further maintains that such evidence "had no other impact upon the jury other than to evoke a sense of horror or rebuke."

In weighing prejudice, a trial court must consider "the nature of the other bad act. Some acts have a great emotional impact upon a jury and have greater potential for appealing to a juror's sense of resentment or outrage." Smalley, 151 N.H. at 200 (quotation omitted). "Unfair prejudice is inherent in evidence of other similar crimes or prior convictions." Beltran, 153 N.H. at 649 (quotation omitted). The degree of prejudice may depend upon the similarity of the other incidents to those for which the defendant is currently on trial. Id.

Evidence of the defendant's uncharged treatment of Linscott was evidence of abuse, as was the evidence of the charged treatment of J.N. However, such evidence was not likely to have any greater impact upon the jury than the charged acts. See State v. Howe, 159 N.H. 366, 378 (2009). Evidence of the defendant's abuse of Linscott, an adult, would not likely engender a sense of horror or outrage more than would the evidence of the defendant's abuse of J.N., a three-year-old child. As we discussed, the challenged evidence is relevant to explain why Linscott delayed reporting the abuse of J.N. and lied to the police. In light of the State's proffer that J.N. would not testify at trial, Linscott's testimony was crucial to the determination of the defendant's guilt or innocence. Thus, even though evidence of the defendant's abuse of Linscott may have been prejudicial, it was not "so inflammatory as to substantially outweigh its probative value." Id. (quotation omitted). Accordingly, we conclude that the trial court's ruling was not clearly untenable or unreasonable to the prejudice of the defendant's case. See Beltran, 153 N.H. at 649-50.

III.    Expert Testimony on Domestic Violence

The defendant next argues that the trial court erred by allowing the testimony of the State's expert witness on domestic violence.  Expert testimony is admissible under New Hampshire Rule of Evidence 702 "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  N.H. R. Ev. 702.  The determination of the admissibility of expert testimony "rests, in the first instance, within the sound discretion of the trial court."  State v. Searles, 141 N.H. 224, 227 (1996) (quotation omitted).  We reverse its determination "only if the appealing party can demonstrate that the ruling was untenable or unreasonable and that the error prejudiced the party's case."  Id. (quotation omitted).

At trial, the State sought to introduce the testimony of Dr. Scott Hampton, an expert in the field of domestic violence.  Over the defendant's objection, the court allowed Hampton's testimony.  Hampton then generally described the nature and types of domestic violence.  He testified about the progression of domestic violence in an intimate partner relationship and explained why victims often remain in a relationship despite continued abuse.  He explained why victims of such violence do not report, and lie about, the abuse and why a victim of domestic violence might fail to protect his or her child in an abusive situation.  He further described the effects that a victim's child, who is a non-biological child of the perpetrator of the abuse, would have on the dynamics of a relationship involving domestic violence.  Hampton stated that he had not reviewed any of the evidence in this case, and he did not give an opinion relative to this case.

Relying upon Searles, the defendant argues that the court erred by allowing Hampton to testify about domestic violence because "such evidence is only admissible when a victim recants or otherwise minimizes the subject abuse during her testimony," and, here, Linscott "never minimized or recanted any of her statements about the abuse to which she was subject."  Assuming that the defendant preserved this argument for appeal, we disagree with the defendant that Searles stands for the proposition that a victim of domestic violence must recant her statements or minimize the abuse in order for expert testimony on domestic violence to be admissible.

In Searles, the defendant argued that the trial court erred by allowing the State to introduce expert testimony concerning domestic violence syndrome in his trial for second degree assault against his girlfriend and their daughter.  See id. at 225-26.  He maintained that the expert's testimony was irrelevant because the victims did not minimize their injuries or the defendant's conduct in their trial testimony.  Id. at 228.  We disagreed.  Id. at 228-29.

8

Recognizing that courts in other jurisdictions have approved the use of expert testimony about the effects of domestic violence, we explained that domestic violence syndrome offers an explanation for particular actions and statements of domestic violence victims that may seem counterintuitive, such as a victim's recantation or minimization of abuse at trial. Id. at 227. When this sort of behavior is at issue, the testimony of a qualified expert may aid the jury in assessing the credibility of a domestic violence victim. Id. at 228. Given the testimony by the victims in that case, we held that the trial court did not err by concluding that evidence had been presented from which a jury could reasonably find that the victims had minimized their injuries and the defendant's actions and that this minimization would likely be puzzling to the lay observer. Id. at 228-29. In those circumstances, we concluded that expert testimony about domestic violence syndrome could provide a reasonable explanation for the victims' changed account of their injuries and the events in question. Id. at 229. We, therefore, determined that the expert testimony was properly admitted to assist the jury in evaluating the trial testimony of the victims. Id.

Our decision in Searles, however, is not as limited as the defendant suggests. Although in that case we referred to a domestic violence victim's recantation or minimization of abuse at trial, we did not state that those were the only circumstances in which expert testimony about domestic violence syndrome may be admissible. Rather, those were simply two examples of particular actions and statements that may seem counterintuitive to a jury so as to allow for such expert testimony. See id. at 227-29.

Other jurisdictions have allowed expert testimony on the nature and effect of domestic violence in circumstances other than those involving recantation or minimization at trial. See Com. v. Morris, 974 N.E.2d 1152, 1158 (Mass. App. Ct. 2012) (stating that expert testimony on domestic violence is "admissible to help jurors understand the potentially counterintuitive behavior of victims when assessing a victim's credibility"); State v. Grecinger, 569 N.W.2d 189, 197 (Minn. 1997) (holding that expert testimony on battered woman syndrome may be admissible in State's case-in-chief "if it is introduced after the victim's credibility has been attacked by the defense, if it helps the jury understand the victim's inconsistent statements or delay in seeking prosecution of the batterer, and if the expert merely describes the syndrome and its characteristics and does not offer an opinion as to whether the victim suffers from it" (citations omitted)); see also State v. Ciskie, 751 P.2d 1165, 1170-74 (Wash. 1988) (discussing usefulness of expert testimony on battered women's syndrome to trier of fact). Thus, permissible expert testimony on domestic violence is not limited to only those cases in which a victim of domestic violence recants her statements or minimizes the abuse at trial. Accordingly, we reject the defendant's argument because it is based upon the faulty premise that Hampton's testimony was admissible only if Linscott recanted her statements or minimized the defendant's conduct at trial.

9

To the extent the defendant argues that the court erred by admitting Hampton's testimony because Linscott was a witness in this case and "not a victim of a charged crime," this argument has been insufficiently developed for our review. We, therefore, decline to address it. See State v. Roy, 167 N.H. 276, 292 (2015) (declining to address an insufficiently developed argument).

Finally, the defendant argues that admission of Hampton's testimony unfairly prejudiced his case. He asserts that Hampton's testimony "vilified [him] in the eyes of the jury" and "turned [Linscott] from a co-defendant/accomplice into an uncharged victim." We disagree.

Hampton testified exclusively in general terms about domestic violence relationships and why victims of domestic violence act in certain ways. He did not present opinion testimony based upon the facts of this case, nor did he opine as to the credibility of any witness. Hampton's testimony may have closely aligned with Linscott's description of abuse and therefore may have aided the jury in understanding her actions. Contrary to the defendant's suggestion, however, it did not transform his testimony into an opinion that the defendant was an abuser and Linscott a victim. See Morris, 974 N.E.2d at 1161.

Moreover, during Hampton's testimony, the court instructed the jury on several occasions that Hampton was not speaking about any of the individuals involved in this case. The court instructed the jury not to "infer in any way that because Dr. Hampton happens to refer to a he if he's talking about the abuser he means that all abusers are [men] or that it's in any way connected to [the defendant] in terms of his testimony." At the close of the evidence, the court further instructed the jury that it was "not bound by the opinion of the expert" and was "free to ignore the expert's opinion if you find that the reasons given in support of the opinion are not sound or if you find that other evidence outweighs the opinion." The jury is presumed to follow the trial court's instructions, thus diminishing any potential for unfair prejudice from the admission of such testimony. See Costello, 159 N.H. at 123. For these reasons, we do not agree with the defendant that Hampton's testimony invited the jury to base its decision upon something other than the established propositions in the case. See Roy, 167 N.H. at 285.

We conclude that the defendant has not demonstrated that the trial court's decision to allow Hampton's testimony was untenable or unreasonable to the prejudice of his case. Accordingly, we hold that the trial court did not unsustainably exercise its discretion by admitting it.

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.

10