Hillsborough-northern judicial district
No. 2004-695

## THE STATE OF NEW HAMPSHIRE

### v.

### CHRISTOPHER BELTRAN

Argued: February 22, 2006
Opinion Issued: June 14, 2006

*Kelly A. Ayotte*, attorney general (*N. William Delker*, senior assistant attorney general, and *Karen E. Huntress*, assistant attorney general, on the brief, and *Mr. Delker* orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Christopher Beltran, appeals his conviction of two counts of second-degree murder, *see* RSA 630:1-b (1996), following a jury trial in Superior Court (*Barry*, J.). He argues that the trial court erred: (1) in admitting detailed evidence that he physically abused his former girlfriend, Arica Siegel; (2) by refusing to allow him to introduce a police report as extrinsic evidence to impeach Siegel; and (3) by allowing the State to impeach its own witness with a prior inconsistent statement. We affirm.

The jury could have found the following relevant facts. On April 17, 2003, Christopher Squeglia and Amy Knott were shot and killed in a parking lot on Calef Road in Manchester. The defendant was a crack cocaine dealer. His former girlfriend, Siegel, first met the defendant in November 2002, when she was eighteen years old and addicted to crack cocaine. Richard Badeau was a heavy drug user to whom the defendant

sold crack almost every day. Badeau ultimately pled guilty to acting as an accomplice to the murders and testified against the defendant at trial. Knott was also one of the defendant's customers. Squeglia was another drug dealer in Manchester.

Benoit Goupil was a customer of both the defendant and Squeglia. He testified that the defendant said that he did not like Squeglia and thought that he was "no good." In March 2003, Goupil fought with Squeglia; during the fight, several of Squeglia's friends attacked him and broke his jaw. After the fight, Goupil discussed what had happened with the defendant.

Between November 2002 and April 2003, the defendant made several trips to California. On his last trip in April 2003, he told Badeau that he was bringing back two kilograms of cocaine. After his return, the defendant and Siegel went to Manchester on April 16 to sell crack cocaine. They stopped at the home of Richard Case and Linda Segebarth, where the defendant told Case that he had a problem and asked if Case had a gun. Case responded in the negative, and the defendant and Siegel left.

They later stopped at Karen Reed's home. Seigel stayed in the car while the defendant went into the house. Upon his return, he told Seigel that he had run into "a bunch of people on [Reed's] front porch" including Squeglia. The defendant said that Squeglia told him that Goupil deserved to have his jaw broken.

Later in the evening, the defendant met Badeau in the parking lot where the murders took place. Following the meeting, the defendant and Siegel departed. The defendant then received a call from Goupil, and drove to Goupil's home to sell him drugs. Goupil testified the defendant was looking for a gun which he wanted "to put the fear of God into somebody."

The defendant and Siegel next went to Badeau's house, where the defendant had a confrontation with several people, including a woman whom Squeglia was dating. The defendant told her that she and Squeglia had "better watch themselves tonight."

After the house emptied, Badeau took out a pump action shot gun and threw it on the bed. The defendant picked up the gun and unloaded it. He instructed Siegel to wipe off the shells to remove any fingerprints. The defendant put socks on his hands and reloaded the shotgun.

Later, the defendant and Badeau discussed killing Squeglia. Siegel testified that she heard Badeau say, "I'm down with it. I've killed people before," to which the defendant responded, "Let's do it."

The defendant and Badeau then made plans with Squeglia by phone to meet. The defendant, Badeau, and Siegel got into Badeau's truck. The shotgun was in the back seat. They met Squeglia at a convenience store, and told him to follow them. As they were leaving, the defendant and

Badeau discussed where to shoot Squeglia and decided to return to the parking lot where they had met earlier in the evening.

On the way to the parking lot the defendant instructed Siegel to chamber a round in the gun. She did not respond and the defendant yelled at her. She testified that she told the defendant she did not know how and he responded, "You just press the button down by the trigger and you slide the thing up and down." The defendant wanted the gun loaded in advance so that there would be no warning to the victims. Siegel testified that she loaded the gun because she was afraid that she would be harmed by the defendant if she did not do as he instructed.

When they arrived at the parking lot, Squeglia and Knott were waiting. The defendant and Badeau got out of the truck and took the gun. Badeau testified that he saw the defendant carrying the gun toward the back of the truck. He and Siegel both heard two gunshots, a pause, and then two more gunshots. The defendant and Badeau got back into the truck and drove away.

After returning to Badeau's home, the defendant and Siegel left for her parents' home. During the trip the defendant called Goupil, and told him he would not have to worry about "Chris" anymore, and that Squeglia and the woman had been shot. He also instructed Siegel to lie if questioned about what happened.

The defendant was indicted on two counts of first-degree murder. At trial he conceded to being present in the parking lot at the time of the murders, but contended that Badeau, who pled guilty to being an accomplice to second-degree murder and testified against the defendant at trial, murdered the victims.

Prior to trial, the State filed a motion *in limine* to admit evidence that the defendant had abused Siegel. Specifically, the State offered evidence that the defendant physically abused her by pulling her hair, punching and beating her, and on several occasions shooting her with a taser gun, to explain why Siegel loaded the gun for the defendant prior to the murders and why she initially withheld information from and repeatedly lied to the police. After a hearing at which Siegel testified about the abuse and its impact on her conduct on the night of the murders, the trial court found that the evidence was "highly relevant" to explain her conduct, that there was clear proof of the bad acts, and that the "probative value of the evidence [was] far greater than the prejudice, in particular in light of the defendant's claim that Richard Badeau committed the murders and not the defendant."

A jury found the defendant guilty of two counts of second-degree murder. *See* RSA 630:1-b. This appeal followed.

On appeal, the defendant first argues that the trial court erred when it permitted the State to elicit testimony from Siegel that he subjected her to physical abuse, including the repetitive use of a taser stun gun. Siegel testified that on one occasion, the defendant shot her with a taser gun while she was naked in the shower. The defendant argues that "the issue of why [Siegel] loaded the gun [for the defendant] was not sufficiently important to justify admitting the details of [his] ... treatment of his girlfriend." He contends that "[i]n light of its low probative value, the prejudicial impact of [the] testimony mandated that the evidence be excluded." Finally, the defendant argues that the evidence had an "unmistakable tendency to isolate [him], as opposed to Badeau, as the man who acted in conformity with his character when he committed these murders."

New Hampshire Rule of Evidence 404 (b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The purpose of Rule 404(b) is to ensure that the defendant is tried on the merits of the crime as charged and to prevent a conviction based upon evidence of other crimes or wrongs. *State v. Bassett*, 139 N.H. 493, 496 (1995). We have established a three-part test for the admissibility of evidence under Rule 404(b): (1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof that the defendant committed the act; and (3) the probative value of the evidence must not be substantially outweighed by its prejudice to the defendant. *State v. Smalley*, 151 N.H. 193, 196 (2004). The State bears the burden of demonstrating the admissibility of prior bad acts. *Id.* We review the trial court's ruling for an unsustainable exercise of discretion, and will reverse only if it was clearly untenable or unreasonable to the prejudice of the defendant's case. *Id.* The defendant claims that the State failed to meet its burden, challenging the trial court's decision with respect to the first and third prongs of the Rule 404(b) analysis.

In order to meet its burden under the first prong, the State is required to specify the purpose for which the evidence is offered and articulate the precise chain of reasoning by which it will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity. *Id.* To be relevant,

prior bad acts must be in some significant way connected to material events constituting the crime charged and not so remote in time as to eliminate the nexus. *State v. McGlew*, 139 N.H. 505, 507 (1995).

The State contends that the trial court "properly exercised its discretion when it permitted the State to introduce details of the defendant's abuse of Siegel in order to explain her conduct during the murders and her lies to the police afterward." The State argues that the "[s]pecific evidence of the nature of the abuse was necessary for the jury to understand why Siegel would have engaged in the extreme conduct of loading the murder weapon [for the defendant] that was used to kill two people and then [why she lied] to the police about the defendant's responsibility." The defendant argues that "this issue was not so critical as to warrant the admission of the abuse evidence, especially the taser evidence." We disagree.

At trial it was the defendant's theory that Siegel was lying because she was concerned about her own criminal liability. The defense cross-examined her extensively and introduced extrinsic evidence to prove that she had lied in the past to get herself out of trouble. Thus, the evidence was relevant to rebut the claim that Siegel was lying, and to explain her conduct on the night of the murders and why she initially lied to the police about the murders.

During a hearing out of the presence of the jury, Siegel testified that she was "scared that [the defendant] might do something to [her] or have someone hurt [her]." She testified that in the past the defendant had told her that "he could have [her] watched and that he could have someone hurt [her] or beat [her] up or do something to [her] or [her] family if [she] ever did anything wrong." She also testified that she loaded the gun just prior to the murders because she was afraid that the defendant would hurt her if she disobeyed his orders.

■ For purposes of this case, the detailed evidence of the defendant's abuse of Siegel was admissible to explain her submission to the defendant's demands surrounding the murders and her delay in reporting. *Cf. United States v. Powers*, 59 F.3d 1460, 1465 (4th Cir. 1995) (evidence of appellant's violence against a victim was admissible to explain the victim's submission to the acts and her delay in reporting). The defendant argues that the specific circumstances of the abuse were irrelevant because he did not intend to challenge that he was abusive towards Siegel or the effects of the abuse upon her. As the trial court aptly noted, the defendant's abuse of Siegel was relevant for non-propensity reasons to explain her justifiable fear of the defendant that prompted her to chamber the round and subsequently lie to the police. *Cf. State v. Martin*, 138 N.H. 508, 518-19 (1994). We conclude that the evidence was relevant under Rule 404(b) for

purposes other than proving the defendant's character or disposition. *See State v. Berry*, 148 N.H. 88, 92 (2002). Additionally, it was also highly relevant to her credibility, an issue vigorously pursued at trial.

The defendant next argues that the trial court erred in its analysis under the third prong of Rule 404(b). Under this prong, evidence of prior bad acts is admissible if the danger of unfair prejudice to the defendant does not substantially outweigh the probative value of the evidence. *Smalley*, 151 N.H. at 198. Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, or provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision upon something other than the established propositions in the case. *State v. Fernandez*, 152 N.H. 233, 240 (2005). It is not, however, evidence that is merely detrimental to the defendant because it tends to prove his guilt. *Id.* We accord considerable deference to the trial court's determination in balancing prejudice and probative worth under Rule 404(b). *Smalley*, 151 N.H. at 198. To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

The defendant argues that even if evidence of the abuse was relevant, it was unduly prejudicial. "Unfair prejudice is inherent in evidence of other similar crimes or prior convictions." *Id.* at 200 (quotations and brackets omitted). The degree of prejudice may depend upon the similarity of the other incident to that for which the defendant is currently on trial. *Id.*

The defendant argues that the murders and the abuse were similar because they were both sadistic in nature. The acts alleged, however, are not sufficiently similar as to increase the degree of prejudice on that basis. While we recognize that the introduction of the details of defendant's physical abuse of Siegel was prejudicial, the similarity argued by the defendant is too tenuous in nature to warrant exclusion of the evidence of abuse. The defendant also contends that the evidence left the jury with the misimpression that his "sadistic behavior toward [Siegel] made it more likely that he, as opposed to Badeau, behaved as the State claimed." The record reveals that substantial evidence of Badeau's prior history of violence, his bad character and behavior towards others was admitted, and that the jury was unlikely to have been misled into believing that Badeau would have been less likely to commit the murders because he was more virtuous than the defendant.

The trial court ruled: "The probative value of the evidence is far greater than the prejudice, particularly in light of the defendant's claim that Richard Badeau committed the murders and not the defendant." We accord considerable deference to the trial court's balancing of prejudice and probative worth under Rule 404(b). *Id.* at 198. The probative value of the challenged evidence was not substantially outweighed by the danger of unfair prejudice to the defendant. We conclude that the trial court's ruling was neither clearly untenable nor unreasonable to the prejudice of the defendant's case. *Id.*

Next, the defendant argues that the trial court erred in refusing to allow him "to impeach [Siegel's] denial that she ever told a Maine State Trooper, or her mother, that her Stepfather sexually assaulted her." *See* N.H. R. Ev. 613(b). During trial the defendant cross-examined Siegel about an incident when she had run away from home. The defendant's theory was that when Siegel's mother tried to get her to return home, Siegel threatened to accuse her stepfather of sexually abusing her. On cross-examination, Siegel denied reporting to a Maine state trooper that her stepfather had sexually abused her. The trooper had no memory of the statements allegedly made by Siegel regarding the incident. The defendant sought to impeach Siegel by introducing extrinsic evidence of a police report written by a Newmarket police officer in which he had recorded information he received from the Maine state trooper about the incident. The Newmarket officer also had no independent memory of the incident. The trial court concluded that the Newmarket police report was not sufficiently reliable under any exception to the hearsay rule to prove that Siegel had made inconsistent statements to the Maine state trooper and that it was untrustworthy because it contained multiple levels of hearsay. We agree.

Whether testimony is admissible as an exception to the hearsay rule is for the trial court to determine. *See Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 416 (2004). We will not disturb such a determination unless we find it to be an unsustainable exercise of discretion. *Id.* Here, the Newmarket police report contained multiple levels of hearsay. *See State v. Winders*, 127 N.H. 471, 476-77 (1985). In other words, the Newmarket police officer documented a statement made to him by the Maine state trooper, who in turn was repeating a statement made by Siegel. For the report to be admissible, each level of hearsay must be admissible under a specific hearsay exception. *See State v. Francoeur*, 146 N.H. 83, 87 (2001). The defendant makes no argument on appeal that a hearsay exception applies to the Maine state trooper's statement to the Newmarket police officer. The trial court properly found

that the statements contained in the document lacked the characteristics of trustworthiness and reliability that would justify its admission as an exception to the hearsay rule. *See Town of Weare v. Paquette*, 121 N.H. 653, 659 (1981). Moreover, the trial court noted that the defendant had subpoenaed Siegel's mother, who could have testified whether Siegel threatened to accuse her stepfather of molesting her. The trial court properly exercised its discretion in precluding the defendant from introducing the police report.

Finally, the defendant argues that the trial court erred in permitting the State to impeach its own witness with a prior inconsistent statement. During Goupil's testimony on direct examination by the State, he expressly denied that he ever told anyone that he had talked to the defendant prior to the murders about someone coming out from Nevada to "take care of" the situation with Squeglia. The State impeached Goupil on this point by calling his girlfriend, Tina Baraw, to testify that he had told her specifically that he had someone coming from Nevada or Las Vegas to take care of the situation with Squeglia. Following this testimony, the trial court immediately instructed the jury that they could consider Goupil's prior statement only in assessing his credibility and not as substantive evidence of the truth of the statement.

The defendant argues that a party may not impeach its own witness with a prior statement when the primary purpose for doing so is to place otherwise inadmissible hearsay before the jury. The State counters that it did not call Goupil as a subterfuge to present hearsay evidence. Instead, it contends that Goupil gave extensive testimony that was crucial to its case. In addition, the State argues that the trial court minimized any potential misuse of Baraw's testimony by instructing the jury, after the impeachment evidence was introduced, that it could not be used substantively, but only to evaluate Goupil's credibility.

New Hampshire Rule of Evidence 607 provides that the "credibility of a witness may be attacked by any party, including the party calling the witness." New Hampshire Rule of Evidence 613(b) provides that such impeachment may be accomplished by use of a prior inconsistent statement. We have construed Rule 607 as enabling a trial court, in the exercise of its sound discretion, to allow a witness's prior statements to be used for impeachment purposes even when the party calling the witness already knows the substance of the anticipated trial testimony and is, therefore, not surprised by it. *See State v. Soldi*, 145 N.H. 571, 573 (2000). We will not reverse a trial court's ruling on the admissibility of said evidence absent an unsustainable exercise of discretion. *See State v. Bader*, 148 N.H. 265, 274 (2002), *cert. denied*, 538 U.S. 1014 (2003).

In *Soldi*, we stated:

> While the [witness's] prior inconsistent statement may be admitted to attack [his] credibility even if the statement tends to directly inculpate the defendant, the State may not use a statement under the guise of impeachment for the *primary* *purpose* of placing before the jury otherwise inadmissible substantive evidence. This limitation prevents the State from using impeachment by prior inconsistent statement as a mere subterfuge to avoid the hearsay rule.
>
> Where the State has called a witness whose corroborating testimony is instrumental to constructing the State's case, the State has the right to question the witness, and to attempt to impeach [him], about those aspects of [his] testimony that conflict with the State's account of the same events. . . .
>
> In analyzing whether impeachment of a party's own witness would constitute subterfuge, courts look at whether the witness's testimony contains relevant evidence other than the impeaching evidence.

*Soldi*, 145 N.H. at 574 (citations, quotation and brackets omitted).

▪ ■ Contrary to the defendant's assertion, we conclude that Goupil's testimony contained evidence that was relevant to, and instrumental in, constructing the State's case. Consequently, the trial court committed no unsustainable exercise of discretion when it permitted the State to impeach Goupil, followed by a limiting instruction, about an aspect of his testimony that conflicted with the State's account of the same events. *See id.* The limiting instruction minimized the possibility of misuse of Baraw's testimony and the potential for unfair prejudice. *See State v. Dean*, 129 N.H. 744, 750 (1987) (defendant's claim of prejudice from potential substantive use of prior consistent statement unfounded, especially in light of trial court's limiting instruction). The jury is presumed to follow the instructions given by the trial court. *State v. Fortier*, 146 N.H. 784, 793 (2001). Accordingly, we find no error.

*Affirmed.*

GALWAY, J., concurred; BROCK, C.J., retired, specially assigned under RSA 490:3, concurred; DALIANIS, J., concurred specially.

DALIANIS, J., concurring specially. While I agree with the result reached by the majority, I believe that the trial court erred by admitting into evidence detailed testimony from Siegel regarding the abuse she suffered at the defendant's hands, including testimony that the defendant

repeatedly attacked her with a taser stun gun, once while she was showering.

New Hampshire recognizes that evidence of other crimes, wrongs or acts is typically inadmissible as character evidence, but that it may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." N.H. R. Ev. 404(b). As the majority notes, there is a three-part test for admissibility under Rule 404(b): (1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof that the defendant committed the act; and (3) the probative value of the evidence must not be substantially outweighed by its prejudice to the defendant. *State v. Smalley*, 151 N.H. 193, 196 (2004).

The defendant did not challenge the admission of general evidence that he was abusive to Siegel and that she was afraid of him. While evidence that Siegel was abused by and afraid of the defendant was, arguably, relevant to explaining Siegel's conduct, evidence detailing the defendant's savagery in inflicting the abuse was not. Such evidence, including Siegel's testimony that the defendant assaulted her on numerous occasions with a taser gun, could be relevant only to show that the defendant was a man of despicable and violent character, and was plainly offered for that purpose.

I disagree with the majority's conclusion that this evidence was admissible under Rule 404(b) to explain Siegel's submission to the defendant, because I do not believe that "explaining witness submission" is a category contemplated for admissibility under Rule 404(b). In my view, cataloging the incidents and behavior underlying a witness's submission to a defendant can only be considered evidence of the defendant's character or propensity to commit the charged crime.

Moreover, I do not believe that Rule 404(b) contemplates the admission of evidence prejudicial to the defendant simply because it is relevant to a witness's credibility as the trial court found. In *State v. Berry*, 148 N.H. 88 (2002), we considered whether evidence demonstrating that the defendant abused his adopted daughter and created an atmosphere of fear in his family's household was admissible, under Rule 404(b), to explain the daughter's delay in reporting sexual abuse suffered at the hands of the defendant. *Id.* at 92. We held that it was. *Id.* In *Berry*, however, the conduct portrayed by the evidence (physical abuse) did not tend to demonstrate a propensity towards the conduct for which the defendant was being tried (sexual assault). In the instant case, the proffered evidence tended to reinforce the notion that the defendant was inclined to commit the violent act for which he was being tried. I believe that the position taken by the majority may allow prosecutors to bolster the credibility of a

dubiously reliable witness while simultaneously gaining the admission of prejudicial propensity evidence. Such a result would undermine the purpose of Rule 404(b).

I believe that Siegel's testimony detailing the defendant's violent acts towards her fails the first and third prongs of the three-part test. As such, I believe that the trial court should have found it inadmissible pursuant to Rule 404(b).

Nevertheless, it is my opinion that the trial court's error was harmless. The harmless error standard is as follows:

> In determining the gravity of an error, this court asks whether it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict. The evaluation of whether this standard has been achieved involves consideration of the alternative evidence presented at trial and of the character of the inadmissible evidence itself. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt.

*State v. Enderson*, 148 N.H. 252, 255 (2002) (quotation omitted). The State bears the burden of proving harmless error. *Id.*

Here, the alternative evidence of the defendant's guilt was overwhelming. This case involved a ten-day trial with over twenty-five witnesses. The evidence included detailed testimony from key witnesses regarding the defendant's conduct surrounding the murders. The jury heard testimony from both Siegel and Badeau about the events that took place in the parking lot. In addition, both testified about the defendant's conduct leading up to and following the murders. The jury heard evidence of the defendant's effort to obtain a gun prior to the murders and his admissions to Goupil immediately following the murders. Moreover, the jury heard the defendant's own lies to police about his involvement in the murders, which were directly contradicted by his cellular phone records and other evidence that placed him at the scene of the murders. After a review of the record, I am convinced beyond a reasonable doubt that the jury would have convicted the defendant without the evidence of the abuse. Accordingly, I believe that the trial court's error was harmless, and I concur in the result.