Belknap
No. 2009-342

THE STATE OF NEW HAMPSHIRE

v.

KIRKMAN J. CASSAVAUGH, III

Argued: June 23, 2010
Opinion Issued: November 10, 2010

*Michael A. Delaney*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Stephanie Hausman*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. After a jury trial in Superior Court (*Smukler*, J.), the defendant, Kirkman J. Cassavaugh, III, was convicted of first degree murder in the death of Jeremy Huard, RSA 630:1-a, I(a) (2007), and second degree murder in the death of Jennifer Huard, RSA 630:1-b, I(a) (2007). The defendant appeals, arguing that the trial court erred by: (1) admitting evidence that he previously threatened to kill Jennifer; (2) admitting evidence that he terminated his initial interview with the police; and (3) admitting evidence of a second police interview from which statements he made invoking his right to be silent had been redacted. We affirm.

A jury could have found the following facts. During the summer of 2006, the defendant and Jennifer Huard were involved in a romantic relationship. The defendant and Jennifer's brother, Jeremy Huard, were friends. The three often engaged in drug use together at the defendant's trailer, which was situated on land owned by his grandparents. The defendant and Jennifer often argued, however, and the relationship was troubled.

During that summer, Krystal Sanborn made a telephone call to Jennifer during which she overheard a man yelling at Jennifer in a voice filled with rage. She heard the man call Jennifer a "whore" and say he was "going to f. . . . .g kill her." Jennifer explained to Sanborn that it was the defendant who was yelling and that they often fought.

In September 2006, Jennifer moved her belongings out of the defendant's trailer and into her father's home. However, both she and Jeremy

remained in contact with the defendant. On the night of September 19, 2006, the defendant, Jeremy, and several acquaintances were at the defendant's trailer consuming drugs. After the acquaintances had departed, Jennifer called the defendant asking to be picked up from a house in Franklin. Together the defendant and Jeremy drove to pick her up.

During the car ride back to the defendant's trailer, the defendant and Jennifer argued. The argument continued after they arrived at the trailer, waking Marc Thomson, who lived in a recreational vehicle nearby. Thomson looked out his window to see the defendant punching Jeremy and throwing him to the ground. Thomson yelled to the defendant, "Don't kill him, Kirk." He got dressed and when he again looked out his window he observed the defendant dragging Jennifer by her feet out the door of the trailer.

Shortly thereafter, the defendant knocked on Thomson's door and told Thomson that he had "killed them." He asked for Thomson's help in dragging the bodies to the back of his trailer in order to burn them. Thomson responded that burning the bodies at night would attract attention and instead offered to help by warming up his car. Thomson then drove away, leaving the defendant at the property. Later that morning, Thomson reported to the police what had taken place. Based on Thomson's report, the police obtained permission from the defendant's grandparents to search the property. They found both bodies in debris piles behind the defendant's trailer.

Autopsies revealed that Jennifer died within seconds of suffering a gunshot wound to her chest, while Jeremy died of multiple stab wounds and contributing gunshot wounds. Jennifer also sustained a second gunshot wound to her shoulder and there had been bleeding under the skin on the back of her head that was consistent with having been dragged down stairs. Jeremy suffered twelve stab wounds, as well as gunshot wounds to his face, back and buttocks. Marks on Jeremy's neck were consistent with having been strangled. Jeremy also sustained a forehead injury, which was consistent with having been struck with the butt end of a rifle. His body had abrasions that were likely caused after death and which were consistent with his body having been dragged.

According to forensic reports, Jennifer's blood appeared in numerous areas of the defendant's kitchen. Jeremy's blood was found on the defendant's carpet, floor mat and walls. The defendant's bare footprint was discovered on the floor mat, which was covered in Jeremy's blood.

There were bullet holes in the front door of the defendant's trailer, in a wall beside the refrigerator, and in the defendant's refrigerator door. A bullet removed from Jennifer's body was identified as having been fired from a rifle seized from the defendant's trailer. A second bullet, discovered in the trailer, was identified as having been fired from the same rifle. The

defendant's finger and palm prints were the only prints discovered on the rifle. The bullet holes found in the refrigerator had been freshly filled with caulking and a tube of the same caulking was discovered in the defendant's trash.

Police conducted interviews with the defendant both before and after the discovery of the bodies. In the initial interview, the defendant did not appear surprised or concerned to learn that Jeremy and Jennifer were missing. He characterized Jennifer as a "miserable bitch," and stated that she and Jeremy left his house on foot at approximately 4:00 a.m. that morning, after he engaged in an argument with Jennifer. When the police began to press the defendant about whether he had killed either Jennifer or Jeremy, however, his demeanor changed. His breath quickened, he slumped in his chair, and he began to look "sickly," although he continued to deny any involvement in the killings. He then asked to end the interview and the interview was terminated.

Police conducted a second interview after the victims' bodies were found. The defendant was read his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), which he waived, and he agreed to speak with the officers. After the conversation turned to his potential involvement in the murders of Jennifer and Jeremy, however, the defendant invoked his right to remain silent. He was subsequently arrested. While in the booking area the defendant was agitated and spontaneously exclaimed, "I didn't kill them. They attacked me." Later, he made the unprompted statement, "This all stemmed from me being kicked in the balls and being pushed into my . . . TV."

The defendant was indicted on six counts of murder in the deaths of Jeremy and Jennifer Huard. Specifically, he was charged with one count of first degree murder and two alternative counts of second degree murder with respect to each victim. Before trial, the State successfully moved, over the defendant's objection, to admit the testimony of Krystal Sanborn, as well as portions of the transcripts and videotaped recordings of the two police interviews of the defendant. On appeal, the defendant challenges the admission of all that evidence.

## I. Witness Testimony

We first consider the admission of Krystal Sanborn's testimony. Prior to trial, the State moved to admit, in its case-in-chief, Sanborn's testimony that she heard the defendant threaten to kill Jennifer. The defense objected. After an evidentiary hearing, the trial court ruled that the evidence was admissible under New Hampshire Rule of Evidence 404(b).

"The purpose of Rule 404(b) in a criminal trial is to ensure that the defendant is tried on the merits of the crime as charged and to prevent a conviction based on evidence of other crimes or wrongs." *State v. Bassett*, 139 N.H. 493, 496 (1995). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b). A three-part test has been established for determining the admissibility of evidence under Rule 404(b): "(1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof that the defendant committed the act; and (3) the probative value of the evidence must not be substantially outweighed by its prejudice to the defendant." *State v. Beltran*, 153 N.H. 643, 647 (2006). "The State bears the burden of demonstrating the admissibility of prior bad acts." *Id.* Nevertheless, "[i]n ruling on the admissibility of evidence under Rule 404(b), the trial court exercises its sound discretion, and we will find error only if the defendant can show that the ruling was clearly untenable or unreasonable to the prejudice of his case." *Bassett*, 139 N.H. at 496 (citation omitted).

The defendant challenges the admissibility of the statement under the first and third prongs of the Rule 404(b) test, arguing that the testimony was irrelevant except to improperly show his propensity to commit violence and that the prejudice to his case substantially outweighed the probative value of the evidence. The State counters that the evidence was admissible because it was relevant to prove the defendant's intent and because its probative value outweighed any prejudicial effect.

To meet its burden under the first prong of the Rule 404(b) test, the State must "specify the purpose for which the evidence is offered and articulate the precise chain of reasoning by which it will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character or propensity." *Beltran*, 153 N.H. at 647. "To be relevant [to intent], prior bad acts must be in some significant way connected to material events constituting the crime charged and not so remote in time as to eliminate the nexus." *Id.* at 647-48.

The defendant argues that because his defense was that someone else committed the murders, the issue of intent was not an issue "actually in dispute." *Id.* Therefore, he contends, the testimony should not have been admitted. We disagree.

We have considered the issue of intent with respect to a defendant's prior threats in several cases. For example, in *State v. Pepin*, 156 N.H. 269 (2007), the defendant was charged with, among other crimes, attempted murder and first degree assault. He argued that evidence of his prior threat to shoot and kill the victim should have been inadmissible at trial. We held that the prior threat was relevant to the defendant's intent to commit the charged crime because it was "directed at the same victim and in a similar context as the charged offenses; *i.e.*, his efforts to intimidate the victim when she did something he disliked." *Id.* at 278. Therefore, it was more probable than not that when the defendant later assaulted the victim, he did so with the purpose to cause her death or bodily injury. *Id.; see State v. Brewster*, 147 N.H. 645 (2002) (prior threat against victim admissible to prove harassment and criminal threatening charges because probative of defendant's motive and intent and victim's state of mind); *State v. Simonds*, 135 N.H. 203, 207 (1991) (prior sexual contact with victim admissible to show intent to touch victim for sexual gratification).

Similarly, in *State v. Sawtell*, 152 N.H. 177 (2005), the defendant, who was charged with first degree murder, argued that the trial court erred by admitting evidence of his prior threats to the victim. We held that evidence of prior threats to the victim with a gun were relevant to prove intent because the prior acts involved the same parties, a similar weapon, and occurred under similar circumstances. *Id.* at 182; *see State v. Richardson*, 138 N.H. 162 (1993) (prior threats against victim admissible to prove assault because probative of defendant's intent to intimidate and terrorize victim).

We have held that "[w]hen intent is not conceded by the defense, and it is an element of the crime to be proven by the State, it is sufficiently at issue to require evidence at trial." *Pepin*, 156 N.H. at 279 (quotation omitted). Here, the defendant was charged with first degree murder pursuant to RSA 630:1-a, I(a) (2007), and he did not stipulate to intent. Thus, pursuant to the statute, the State was required to prove that the defendant acted purposely. RSA 630:1-a, II (2007); *State v. Glodgett*, 144 N.H. 687, 691-93 (2000) (finding that in general, State may not introduce Rule 404(b) evidence where defendant has stipulated to the relevant element of the charged crime). "Purposely" means "that the actor's conscious object is the death of another, and that his act or acts in furtherance of that object were deliberate and premeditated." RSA 630:1-a, II (2007). Accordingly, the State was required to establish the defendant's specific intent to kill Jennifer and the prior threat was relevant for that purpose.

Moreover, the threat was delivered to Jennifer just two months prior to her murder and was thus not so remote in time as to eliminate the nexus between it and the charged event. *See Pepin*, 156 N.H. at 278 (concluding that threat made five months before charged event was not so distant in time as to eliminate the nexus between them); *State v. Allen*, 128 N.H. 390 (1986) (concluding that threat made three years before charged event was sufficiently proximate for threat to be relevant). Further, the threat was made under circumstances similar to the events on the night of Jennifer's death; that is, the threat was made during the course of a heated argument between Jennifer and the defendant. Evidence of the prior threat therefore went directly to whether the defendant intended to kill Jennifer when he shot her, and whether his actions were deliberate and premeditated. Accordingly, we hold that the trial court properly exercised its discretion when it permitted the testimony of Sanborn as relevant to prove intent.

■■ The defendant next argues that the prejudicial effect of the testimony substantially outweighed its probative value.

> Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case. Unfair prejudice is not, of course, a mere detriment to a defendant from the tendency of the evidence to prove his guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial. Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged.

*State v. Yates*, 152 N.H. 245, 249-50 (2005). "We accord considerable deference to the trial court's determination in balancing prejudice and probative worth of evidence under Rule 404(b)." *Pepin*, 156 N.H. at 278 (quotation and citation omitted). "Particularly pertinent to determining this balance is whether the evidence is relevant to prove an issue that is actually in serious dispute." *Id.* at 278-79.

■ As noted above, the prior threat to kill Jennifer was relevant to the defendant's intent. "[B]ecause the issue of the defendant's intent was central to the trial of this matter, the probative value was significant." *State v. Ayer*, 154 N.H. 500, 513 (2006). Further, we do not find that the danger of unfair prejudice substantially outweighs the testimony's probative value. Sanborn's testimony was brief and "not so unduly emotional as to inflame

a jury." *State v. Jordan*, 148 N.H. 115, 118 (2002). Although Sanborn's testimony that the defendant threatened to kill Jennifer may have been prejudicial, "we cannot conclude that the evidence was so inflammatory as to substantially outweigh its probative value." *State v. Nightingale*, 160 N.H. 569, 575 (2010) (quotation omitted). Accordingly, we hold that the trial court did not unsustainably exercise its discretion when it admitted evidence of the defendant's prior threat under Rule 404(b).

We reject the defendant's contention that the trial court erred in failing to issue a limiting instruction during Sanborn's testimony; because he failed to request a limiting instruction, he cannot complain of error. *See State v. Ericson*, 159 N.H. 379, 389 (2009). In light of the above rulings, we need not consider the State's contention that the defendant's prior threat was independently admissible as an admission by a party-opponent under Rule 801(d)(2)(A).

*II. Transcript and Videotaped Recording of First Police Interview*

We next consider the defendant's argument that the trial court erroneously admitted that portion of the transcript and videotaped recording of his initial police interview in which he expressed his desire to terminate the interview. Because trial counsel did not object to admission of the evidence, the defendant relies on the plain error rule in support of his argument.

The State counters that precisely because defense counsel affirmatively stated she had no objection to the admission of this evidence, the defendant cannot now argue for a plain error analysis. Thus, the State asserts that the invited error doctrine precludes the defendant from availing himself "of error into which he has led the trial court, intentionally or unintentionally." *State v. Goodale*, 144 N.H. 224, 227 (1999). We disagree with this assertion.

In *State v. Richard*, 160 N.H. 780, 788 (2010), we recently determined that the invited error doctrine does not preclude a court from undertaking plain error review. To hold otherwise would "remove[] any discretionary remedy from the appellate court's panoply of options and subjugate[] the interests of justice to the demands of a procedural mechanism." *Id.* at 788 (quotation omitted). Accordingly, we will consider whether the trial court committed plain error.

"A plain error that affects substantial rights may be considered even though it was not brought to the attention of the trial court or the supreme court." SUP. CT. R. 16-A. "However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." *State v. Russell*, 159 N.H. 475, 489 (2009). To find plain error: "(1) there must be an error; (2) the error must be plain; (3) the error

must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* We have looked to federal plain error analysis in applying our plain error rule. *Id.* at 489-90.

Turning to the first prong of the plain error test, we conclude that the trial court erred when it admitted evidence of the defendant's invocation of his right to remain silent. It is well-settled law in this jurisdiction that "use of pre-arrest silence in the State's case-in-chief, in which the defendant does not testify, is unconstitutional." *State v. Remick*, 149 N.H. 745, 747 (2003). As we noted in *Remick*, we find instructive the First Circuit's analysis of pre-arrest silence in *Coppola v. Powell*, 878 F.2d 1562 (1st Cir.), *cert. denied*, 493 U.S. 969 (1989). In *Coppola*, the court stated that "the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 1568.

The State argues that the instant case is distinguishable from *Remick*, because there the defendant asserted his right to silence prior to answering a single question from police. *Remick*, 149 N.H. at 746-47 (concluding that a police officer's testimony in the State's case-in-chief that he "went over to the defendant to ask him what happened, and at that point he just closed his eyes and wouldn't talk to me," constituted a violation of the defendant's Fifth Amendment privilege against self-incrimination). Thus, the State argues, there was no concern in *Remick* that a jury might be confused by an abrupt cessation in the questioning, or that the jury might, as a result, improperly conclude that the police had failed to allow the defendant adequate opportunity to explain himself. The State argues that where, as here, the defendant has engaged in an extensive interrogation session with police before invoking his right to silence, there are such concerns. Thus, the State asserts that it was proper for the trial court to allow evidence that the defendant terminated the interview in order to prevent confusion or alarm over potentially improper police tactics. In support of this argument, the State cites cases from other jurisdictions, most notably *Commonwealth v. Waite*, 665 N.E.2d 982 (Mass. 1996), *Commonwealth v. Habarek*, 520 N.E.2d 1303 (Mass. 1988), and *United States v. Williams*, 556 F.2d 65 (D.C. Cir.), *cert. denied*, 431 U.S. 972 (1977). We find these cases distinguishable.

*Waite* and *Habarek* stand for the proposition that where the defense has created confusion over a police interview, the State is entitled to offer evidence to clarify that confusion, including evidence that the defendant terminated it. *Waite*, 665 N.E.2d at 988 (finding that evidence of a defendant's pre-arrest silence was admissible because the defendant

initiated his confession with police and thus played a role in creating the confusion at trial); *Habarek*, 520 N.E.2d at 1306 (concluding that evidence of pre-arrest silence was admissible because defense counsel created confusion by raising the topic at trial). *Williams* concerns testimony elicited from a police officer in order to impeach the credibility of a defendant who chose to testify at trial. *Williams*, 556 F.2d at 66. Here, however, there is no assertion that either the defendant or his counsel created confusion at trial that would necessitate clarification. Nor did the defendant take the stand and subject himself to impeachment by the prosecution. The State simply introduced into evidence, in its case-in-chief, a transcript and videotaped recording of the defendant's initial police interview, including his specific request to terminate that interview. This was error.

We next consider whether the error was plain. *Russell*, 159 N.H. at 489. We need not decide this issue because even assuming that the error was plain, we conclude that it did not affect the defendant's substantial rights under the third prong of the plain error analysis. *Id.*

 "[T]o satisfy the burden of demonstrating that an error affected substantial rights, the defendant must demonstrate that the error was prejudicial, *i.e.*, that it affected the outcome of the proceeding." *State v. Lopez*, 156 N.H. 416, 425 (2007). We conclude that, in light of the overwhelming evidence against the defendant, admission of his invocation of his right to remain silent did not affect the outcome of the proceeding. As noted above, the defendant and Jennifer had a tumultuous relationship and the defendant had previously threatened to kill her. He admitted that he was home alone with the victims in the early morning hours before the murders. His neighbor saw him attack Jeremy and drag Jennifer out of the trailer. The defendant admitted killing the victims and asked his neighbor for help in disposing of the bodies. Later that day, the victims were discovered in debris piles behind the defendant's trailer. Their blood was found throughout the defendant's trailer. The defendant's bare footprint was found on a mat covered in Jeremy's blood. The gun used to shoot the victims was discovered in the defendant's home. His finger and palm prints were the only prints on the gun. Bullets from the gun were found in the defendant's trailer. Bullet holes in the refrigerator had been freshly caulked and a tube of caulking was found in the defendant's trash. Accordingly, we conclude that the evidentiary error did not affect the defendant's substantial rights and that it does not warrant reversal.

### III. Transcript and Videotaped Recording of Second Police Interview

Finally, we consider the defendant's argument that the trial court erroneously admitted the transcript and videotaped recording of his second

police interview. Prior to trial, the defendant moved to exclude the interview in its entirety. The trial court ruled it would admit evidence of the interview, but that the portion in which the defendant asserted his Fifth Amendment privilege would be redacted. The defendant argues that this was error under New Hampshire Rule of Evidence 403. We disagree.

Rule 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We review the trial court's determination in balancing prejudice and probative worth for an unsustainable exercise of discretion. *Sawtell*, 152 N.H. at 181. To demonstrate that the trial court's decision is not sustainable, the defendant must show that it was clearly untenable or unreasonable to the prejudice of his case. *State v. Santiago*, 159 N.H. 753, 757 (2010).

The defendant posits three arguments based on Rule 403 considerations: (1) the evidence was minimally probative and highly prejudicial; (2) it was needlessly cumulative of other evidence presented at trial; and (3) it could have misled or confused the jury. We address each argument in turn.

The defendant contends that the redacted interview ended abruptly, which could have led the jury to infer that he asserted his right to remain silent. He further argues that most of the interview contains no inculpatory evidence, and amounts to little more than "casual conversation." Thus, he concludes that the prejudicial effect of the evidence substantially outweighs its probative value. We disagree.

In ruling on the motion to exclude, the trial court determined that because the defendant's demeanor visibly changed when the conversation turned to the murders, and because the interview appeared to reveal the defendant lying to the police about what they would find on a search of his property, the probative value of the evidence was not substantially outweighed by its prejudicial effect. The trial court explained:

> The state correctly asserts that a defendant's conduct after a homicide, including his attempts to conceal the killings as well as any statements he makes, are facts that the jury will be instructed to consider in determining whether the defendant committed first degree murder. . . . The state must establish intent as an element of first-degree murder. As such, insight into the defendant's mind through his statements and demeanor with police is an important link in the state's case. The jury is also entitled to hear evidence

supporting the state's claim that the defendant lied to police during this interview. This purported action relates directly to credibility and consciousness of guilt. Therefore, the statements are highly probative.

The trial court concluded that, "[w]hile the statements may be prejudicial, they do not rise to the level of unfair prejudice because they contain nothing that would cause the jury to decide the case on improper grounds." We agree.

 As noted above, a forensic team searched the defendant's property soon after the murders and found the victims' bodies, as well as bullet holes and blood stains throughout the defendant's home. During the course of the second interview, the police informed the defendant that a forensic team had searched his property. The police then asked the defendant, "What do you think we found?" The defendant replied, "I don't know, but that's just what you said you were going to tell me." In light of the defendant's admitted presence at his property on the day of the interview, where visible blood stains, bullet holes and the victims' bodies were discovered, a jury could find this statement to be dishonest and therefore probative of his guilt. Accordingly, we conclude that the trial court did not err in finding the second interview highly probative. *See State v. Evans*, 150 N.H. 416, 420 (2003) ("It is reasonable to infer consciousness of guilt from a defendant's false exculpatory statement.").

As to prejudice, we conclude the trial court did not err in concluding that admission of the redacted interview was minimally prejudicial to the defendant's case. Although there may have been some potential for speculation on the part of the jury as to why the interview ended abruptly, including speculation that the defendant invoked his privilege against self-incrimination, we find no error in the trial court's determination that the prejudice did not substantially outweigh the highly probative value of the evidence.

 The defendant also argues that this evidence was needlessly cumulative of other evidence presented at trial. Specifically, he argues that police testimony and the admission of the videotaped recording of the first police interview were sufficient to evidence his demeanor as it pertained to a consciousness of guilt. We disagree. We have concluded that the second interview was highly probative of the defendant's consciousness of guilt based on the specific details of that interview. Because the defendant does not argue that a similar conversation occurred during his first interview with police, we do not conclude that evidence of the second police interview is cumulative of the evidence from the first police interview.

The defendant's final argument regarding this evidence is that admission of his statements was unduly confusing to the jury. In support of this argument, the defendant cites *State v. Philbrook*, 138 N.H. 601, 603 (1994), for the proposition that when evidence of flight creates an improper impression, it is error to admit it under Rule 403. We find *Philbrook* to be inapplicable here. *Philbrook* concerned admission of the defendant's statement that he fled after speaking with his attorney. We held that admission of the statement was an unsustainable exercise of discretion because the jury might infer, based on the attorney's statements, that the defendant's own attorney believed him to be guilty. Here, the evidence consists of the defendant's own statements, which the jury was entitled to consider as to consciousness of guilt. *See Evans*, 150 N.H. at 420.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.