NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2018-0222


THE STATE OF NEW HAMPSHIRE

v.

KATHERINE SAINTIL-BROWN

Argued: March 13, 2019
Opinion Issued: April 17, 2019


Gordon J. MacDonald, attorney general (Brandon H. Garod, assistant attorney general, on the brief and orally), for the State.


Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.


HICKS, J. The defendant, Katherine Saintil-Brown, appeals her convictions by a jury in Superior Court (Delker, J.) for negligent homicide, see RSA 630:3 (2016), criminal neglect of an elderly adult, see RSA 631:8 (2016) (amended 2016), and failure to report adult abuse, see RSA 161-F:46 (2014) (amended 2016), :50 (2014). The defendant's convictions were based upon her failure to call for help while her elderly mother, the victim, lay in her own waste on the floor of their shared home for multiple days. On appeal, the defendant argues that the evidence was insufficient for the jury to have convicted her of the three charges. She also argues that the trial court erroneously instructed

the jury on the criminal neglect of an elderly adult charge and that this error requires reversal of her conviction on that charge. The defendant raises her appellate arguments under our plain error rule. See Sup. Ct. R. 16-A. As to the jury instruction issue, the State agrees that the trial court's instruction was erroneous and that the error was plain, but asserts that the error does not require reversal. We affirm.

I. Background

The jury could have found the following facts based upon the evidence at trial and the reasonable inferences to be drawn therefrom. The victim was nearly 76 years old when the events that led to her death occurred. See RSA 631:8, I(d) (defining an elderly adult as a person who is 60 years of age or older). For years, the victim's personal hygiene was lacking. Former co-workers testified that as early as the 1990's, the victim would not use the toilet, but would instead urinate and defecate wherever she was sitting or standing.

When the victim's husband died in 2012, the victim became depressed, and her depression caused her to neglect her personal hygiene even more than before. After her husband died, the victim essentially ceased taking showers. Nor did she clean her home. The walls and floors of her home were full of feces. At one point, her sink was so clogged with food that mice built nests in it. Towards the end of her life, the victim spent her days sitting in a chair, watching television, and talking on the telephone with her sister. She would not leave her chair to toilet, but would instead relieve herself where she sat and would not clean herself after having done so.

The victim's depression also led her to neglect her medical needs. After her husband died, the victim ceased seeing medical service providers because she blamed them for his death. Thus, although her feet were perpetually swollen because of injuries she sustained in a car accident in the 1960s, she refused to get medical care. In addition, the victim was "morbidly obese" and used a walker.

In September 2014, the defendant and her daughter (the victim's granddaughter) moved into the victim's mobile home to take care of her. They "essentially liv[ed] there for free" as the victim paid the monthly rent and for all household utilities, except for internet service. The defendant knew before moving into the victim's home that the home was "filthy" and that the victim "had no personal hygiene." The defendant told her daughter that "the house might be a hazard" and that her daughter would "get sick from living there."

However, even with the defendant and her daughter living with the victim, the victim's personal hygiene remained lacking. One of her feet was swollen and purple, and her home was "unkept, dirty, [and] smelled inside."

2

The defendant and the victim had a strained relationship. Over the years, the defendant was heard telling the victim, "I can't wait until you die so I can get your money."

The victim had an annuity account valued at $50,000 that she opened in March 2014; the defendant and her daughter were the co-beneficiaries of the account. She also had an IRA valued at $17,280; the defendant and her daughter were also the co-beneficiaries of this account.

On February 12, 2016, the victim fell to the floor of her mobile home. She remained there for five days, lying in her own waste, before the defendant called the fire department for a "lift assist." The day of the fall, the defendant and her daughter attempted to lift the victim off the floor, but were unable to do so. The victim also attempted unsuccessfully to lift herself off the floor. According to the victim's granddaughter, the victim was wearing neither pants nor underclothing that day.

The next day, the defendant and her daughter again attempted to lift the victim off the floor, but were, again, unable to do so. On the fourth day after the victim fell to the floor, the defendant and her daughter searched the internet for symptoms of strokes and other ailments because they "wanted to know why she wasn't getting up" and "was just laying there." Nevertheless, the defendant did not call the fire department for help that day. Rather, the defendant decided that if the victim was still unable to get off the floor the following day, she would call for help then. On the fifth day after the fall, because the victim could not get up from the floor, the defendant called the fire department.

When firefighters found the victim, she "was covered in urine and feces." Her thin, cotton nightgown was wet and filthy. Firefighters saw a hole in the floor of the mobile home, approximately four feet from where the victim lay. Firefighters asked the victim to identify the President and to tell them what day and month it was. Firefighters had to ask the victim questions two or three times before she would respond. Her responses were sometimes inappropriate, such as when asked who the President was, she responded, "No." Eventually, she answered the firefighters' three questions, but gave wrong answers to two of them. Based upon her inability to answer all three questions correctly and upon the fact that she had obviously urinated and defecated on herself, the firefighters concluded that the victim had an "altered mental state." Because it was winter and the victim had been on the floor for five days, in addition to taking her blood pressure, firefighters also took her temperature, and discovered that her blood pressure was low (89/54) and that she was hypothermic. Given her altered mental state, the firefighters decided that they had "to do what's best" for the victim and transport her to the emergency room of a local hospital for care.

3

When firefighters removed the victim from her home, she did not protest going to the hospital. The defendant appeared not to show any "concern at all for what was going on" as firefighters attended to the victim. When firefighters asked the defendant why she had not called for help sooner, she did not answer. The defendant told the firefighters that she did not know how the victim ended up on the floor, but guessed that the victim might have tried to sit on her chair and then decided to lie on the floor instead.

The defendant called the hospital twice while the victim was being treated. In the first call, the defendant said that the victim was able to walk around, but that she simply refused to do so. The defendant also said that a social worker had visited the home and told her "that they were not able to force [the victim] to go" and that the defendant should "let [the victim] stay on the floor." However, in February 2016, the first and only report made to adult protective services regarding the victim's fall was made on February 17 by emergency responders. There were no documented visits in February 2016 to the victim's home by adult protective services. The defendant also told the emergency department that, if the victim was soiled, she must have soiled herself on the way to the hospital.

The defendant called the hospital again approximately an hour later, hysterical. She screamed at the nurse who answered the call: "[E]veryone is blaming [me] and it's not [my] fault." She also screamed, "I can't force her to get off the floor. What am I supposed to do? She has rights. Her social worker was here the other day and told me that I couldn't force her." When the nurse explained that no one was blaming her, the defendant continued to scream.

The emergency department physician who examined the victim found her to be "calm and cooperative." Based upon the victim's low blood pressure and body temperature and upon the fact that she had been lying on the floor in her own waste for five days, the physician was concerned that the victim might have a severe infection. Specifically, she was concerned that the victim's infection might have become septic. Such an infection, if left untreated, results in death.

The physician later discovered that the victim had an ulcer on her left inner thigh and black tissue "about the size of a computer mouse" in the same area. An ulcer is the breakdown of skin from pressure. According to the physician, "[b]lack tissue is dead rotting flesh." Based upon CT scans and laboratory test results, the physician diagnosed the victim with necrotizing fasciitis, which is the most common type of necrotizing soft tissue infection.[1]

---

[1] Necrotizing means to cause "necrosis," which is the death of a cell or group of cells. McGraw-Hill Dictionary of Scientific & Technical Terms 1406 (6th ed. 2003). "Fascia" are connective tissues that are under the skin and between the muscles, nerves, and blood vessels. Id. at 779.

Necrotizing soft tissue infection is a rare, serious, aggressive bacterial infection that, in effect, kills the body's soft tissue. It is caused by bacteria that gain entry to the body through an open wound and then burrow into the body's layers of fat and muscle, below the skin. Necrotizing soft tissue infection spreads "[v]ery, very quickly." So-called "flesh-eating disease" is one form of necrotizing soft tissue infection. According to the physician, "[t]he sooner you can initiate treatment[,] the better" because "[t]he longer you wait, the higher [the] likelihood that you die." As another physician testified, "every hour counts" with these kinds of infections. To treat necrotizing soft tissue infection, the infection must be removed surgically. Treatment usually also involves skin grafting and, sometimes, amputation. A CT scan showed that the victim's infection was 6 centimeters deep and was the largest infection that the physician had ever seen.

It was estimated that the infection developed on day three or four after the fall. Physicians opined that the victim developed an ulcer on her leg because she was on the floor for five days, lying in her own waste. The victim's urine and the pressure from being on the floor caused her skin to break down, creating the ulcer, and her fecal matter caused the ulcer to become infected. Had the victim been sitting in her chair for five days instead of lying on the floor, she would not have developed a similar wound. This is so because when a person sits on a chair or another soft surface, he or she constantly shifts weight or makes minor adjustments to alleviate pressure and prevent the development of ulcers. By contrast, a person who is lying on a hard surface, such as a floor, does not have the freedom of movement to make those adjustments, and can develop an ulcer relatively quickly. The risk of developing an ulcer is higher for individuals who are unable to move.

Because the local hospital was not equipped to treat necrotizing fasciitis, the victim was transferred to a Maine hospital. Medical staff there determined that the victim's chance of surviving the required surgeries was "quite low" because her infection was so advanced and because she had other comorbidities. For these and other reasons, it was decided that the victim would be made comfortable while the infection ran its course. The victim died in hospice on February 20. The cause of death was sepsis caused by necrotizing fasciitis. Shortly after the victim died, the defendant and her daughter each received approximately $25,000 from the victim's accounts.

## II. Discussion

The defendant raises her appellate arguments under our plain error rule. Plain error should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result. State v. Pennock, 168 N.H. 294, 310 (2015). To find plain error: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the

5

error must seriously affect the fairness, integrity, or public reputation of judicial proceedings. Id. As to the defendant's arguments that the evidence was insufficient to convict her, we find the evidence to be sufficient. As to her assertion that the trial court's jury instruction constitutes plain error and requires reversal, we assume without deciding that the first three prongs of the plain error test are met, but conclude that the fourth prong is not satisfied. See State v. Russell, 159 N.H. 475, 490-92 (2009) (noting State's concession that first two prongs were met, assuming without deciding that third prong was met, and concluding that fourth prong was not satisfied); see also State v. Page, 171 N.H. ___, ___ (decided March 19, 2019) (slip op. at 11) (where the defendant argued that the trial court erroneously instructed the jury as to the requisite mens rea for the offense, the court declined to address the first three prongs of the plain error test because it concluded that the fourth prong was not satisfied).

A. Sufficiency of the Evidence

We first address the defendant's challenges to the sufficiency of the evidence. When considering a challenge to the sufficiency of the evidence, we objectively review the record to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State. State v. Francis, 167 N.H. 598, 603-04 (2015). The trier of fact may draw reasonable inferences from facts proved as well as from facts found as the result of other inferences, provided they can be reasonably drawn therefrom. Id.

We examine each evidentiary item in the context of all the evidence, and not in isolation. State v. Craig, 167 N.H. 361, 369 (2015). Because a challenge to the sufficiency of the evidence raises a claim of legal error, our standard of review is de novo. Id. at 370. Because, in this case, the defendant chose to present a case, we review the entire trial record to determine the sufficiency of the evidence. See State v. Dion, 164 N.H. 544, 548 (2013).

The defendant has the burden of demonstrating that the evidence was insufficient to prove guilt. State v. Roy, 167 N.H. 276, 292 (2015). When the evidence as to one or more elements of the charged offense is solely circumstantial, a defendant challenging sufficiency must establish that the evidence does not exclude all reasonable conclusions except guilt. Id. The proper analysis is not whether every possible conclusion consistent with innocence has been excluded, but, rather, whether all reasonable conclusions based upon the evidence have been excluded. Id.

By contrast, when the proof involves both direct and circumstantial evidence, a sufficiency challenge must fail if the evidence, including the jury's

6

credibility determinations, is such that a rational trier of fact could find guilt beyond a reasonable doubt, even if the evidence would support a rational conclusion other than guilt if the jury had resolved credibility issues differently. State v. Saunders, 164 N.H. 342, 351 (2012).  Regardless of whether the evidence is solely circumstantial or involves both direct and circumstantial evidence, we still consider it in the light most favorable to the State, and we examine each evidentiary item in the context of all of the evidence, not in isolation.  See State v. Hull, 149 N.H. 706, 712 (2003).

## 1.  Criminal Neglect of an Elderly Adult

The defendant first argues that the evidence was insufficient for the jury to have convicted her of criminal neglect of an elderly adult.  To convict the defendant of criminal neglect of an elderly adult as charged in the indictment, the State had to prove, among other things, that the defendant was the victim's "caregiver," and that the defendant "recklessly" caused "serious bodily injury" to the victim, an elderly adult, by "neglect" in that she allowed the victim to lay on the floor of their shared home for multiple days in her own feces and urine without calling for help.  RSA 631:8, I(b), (f), (h), III.

The defendant advances three challenges to the sufficiency of the evidence on this charge.  She argues that the evidence was insufficient for the jury to have found that she "neglected her duties as a 'caregiver' in any respect as to which she had agreed to provide care," that her "neglect" caused the victim's serious bodily injury, and that she acted "recklessly."

### a.  Caregiver/Neglect

A "caregiver" is "any person who has been entrusted with, or has assumed the responsibility voluntarily, by contract, or by order of the court, for frequent and regular care of or services to an elderly . . . adult, including subsistence, medical, custodial, personal or other care on a temporary or permanent basis."  RSA 631:8, I(b).  A "caregiver" does not include an uncompensated volunteer, unless such person "has agreed to provide care and is aware that the person receiving the care is dependent upon the care provided."  Id.

Although the defendant frames her first argument as an assertion that the evidence was insufficient for the jury to have found that she was a "caregiver" under the statute, on appeal, she does not dispute that she voluntarily agreed to provide certain frequent and regular care of the victim.  See id.  Specifically, she concedes that, viewing the record in the light most favorable to the State, she "undertook to buy and prepare food [for the victim]," which constitutes providing care under the statute.  She contends that her conviction must be reversed, however, because the State "introduced no

7

evidence that [she] neglected her duties as a 'caregiver' in any respect as to which she had agreed to provide care."[2]

"Neglect" within the meaning of RSA 631:8 refers to "the failure or omission on the part of the caregiver to provide the care, supervision, and services which he or she has voluntarily, or by contract, or by order of the court agreed to provide and which are necessary to maintain the health of an elderly . . . adult." RSA 631:8, I(f). Such care includes, but is not limited to, "food, clothing, medicine, shelter, supervision, and medical services, that a prudent person would consider necessary for the well-being of an elderly . . . adult." Id. "'Neglect' may be repeated conduct or a single incident." Id.

Viewed in the light most favorable to the State, the evidence and the reasonable inferences drawn therefrom were sufficient for a rational trier of fact to find, beyond a reasonable doubt, that the defendant voluntarily agreed to do more than just buy groceries for and feed the victim. To the contrary, the jury heard testimony that the defendant and her daughter "had moved in with [the victim] . . . in September 2014 to take care of her." There was also evidence that the defendant and her daughter were in the victim's home to help her with what she could not manage on her own. The jury also heard evidence that the victim could not lift herself off the floor after she fell on February 12, 2016. There was also evidence that the defendant and her daughter tried to help the victim get off the floor by lifting her themselves, but that they, too, failed in the attempt.

Based upon this evidence and the reasonable inferences therefrom viewed in the light most favorable to the State, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that, by failing to call for help earlier, the defendant failed to provide the care she volunteered to provide — to take care of the victim and help her with whatever she could not manage on her own — and that a prudent person would have considered such care necessary for the victim's well-being. As the State aptly argues, "Calling for help in an emergency situation where [the victim] fell and could not get up, despite clearly demonstrating that she desired to, certainly fell within the type

---

[2] To the extent that the defendant asserts that she preserved her "caregiver" appellate argument by raising it in the trial court, we disagree. The defendant's "caregiver" argument in the trial court is different from her "caregiver" argument on appeal. In the trial court, the defendant argued that the evidence on the "caregiver" element was insufficient because there was no evidence that she "provided any level of care for her mother," the victim. By contrast, on appeal, the defendant does not dispute that she provided some level of care to her mother. Because the defendant's "caregiver" argument on appeal differs from her "caregiver" argument in the trial court, we consider her appellate argument not preserved for our review. See State v. Mouser, 168 N.H. 19, 26-28 (2015) (rejecting argument that the defendant was not required to raise specific arguments in support of motion to suppress to preserve them on appeal because, by raising different argument on appeal than the argument presented to the trial court, the trial court was deprived of an opportunity to correct its alleged error). Therefore, we address her appellate "caregiver" argument, like her other appellate arguments, under our plain error rule. See Sup. Ct. R. 16-A.

of care the defendant agreed to provide." We agree with the State that "[t]he evidence presented was sufficient [for] a reasonable jury to conclude that by waiting five days before calling for assistance, the defendant failed to provide the care she agreed to provide, and that removing [the victim] from the floor was necessary to maintain her health."

The defendant contends that the State had to prove that she specifically assumed responsibility for the victim's medical care and hygiene needs. Absent such proof, the defendant argues that the evidence was insufficient to establish that she engaged in "neglect." However, the defendant was not charged with neglect because she failed to obtain medical care or address the victim's lack of personal hygiene. Rather, she was charged with neglect because she allowed the victim to lie on the floor for multiple days in her own waste "without calling for help."

### b. Causation

To establish that the defendant's neglect caused the victim to sustain serious bodily injury, the State had to prove, beyond a reasonable doubt, that her conduct was a substantial factor in bringing about the victim's serious bodily injury and that any other factors were not the sole substantial cause of it. See State v. Lamprey, 149 N.H. 364, 366-67, 369 (2003). Here, the jury heard evidence that the victim likely developed the infection on day three or four after falling. The jury also heard evidence that time is of the essence with necrotizing fasciitis because it spreads so quickly that the longer that treatment is delayed, "the higher [the] likelihood" that the infected person will die. In addition, there was evidence that the victim developed an ulcer on her inner thigh from being on the floor and from urinating on herself, and that the ulcer became infected because the victim defecated on herself. Based upon this evidence and the reasonable inferences therefrom, viewed in the light most favorable to the State, we conclude that a rational trier of fact could have found that the defendant's delay in calling for help was a substantial cause of the victim's necrotizing fasciitis.

In arguing for a contrary result, the defendant asserts that her delay in calling for help could not have been a substantial cause of the victim's necrotizing fasciitis "unless the infection came at some point after [the victim] became incompetent." She contends that had she called for help before the victim became incompetent, the victim "would have refused the assistance, thereby preventing the call from influencing the course of events." This contention is so, she argues, because if the victim had been competent when she refused help, the firefighters could not have provided aid to her over her objection.

The jury was not compelled to find as the defendant speculates. Viewing the evidence and the reasonable inferences therefrom in the light most

9

favorable to the State, we conclude that a rational trier of fact could have found that if the defendant had called for help before the fifth day, the victim would not have refused the assistance. The jury heard evidence that when the firefighters arrived on the fifth day, the victim did not refuse their help. There was evidence as well that, on the very first day that she fell, the victim attempted to lift herself off the floor. There was also evidence that the defendant and her daughter twice tried to help the victim get up from the floor. Thus, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the State, a rational trier of fact could have found that had the firefighters been called before the fifth day, the victim would have accepted their help because she did not want to be on the floor and because such help was necessary to get her off the floor. A rational trier of fact, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the State, could also have found that, even if the victim had refused assistance, the firefighters would have provided it over her objection because they would have viewed a request to remain on the floor in her own waste as evidence of incompetence.

### c. Recklessness

To prove recklessness, the State had to prove that the defendant was aware of, but consciously disregarded, a substantial and unjustifiable risk that her five-day delay in calling for help would result in serious bodily injury to the victim. See Hull, 149 N.H. at 713; see also RSA 626:2, II(c) (2016). Such disregard must have been "a gross deviation from the regard that would be given by a law-abiding citizen." Hull, 149 N.H. at 713; see also RSA 626:2, II(c). "This is a subjective inquiry . . . [that] does not depend upon the actual harm resulting from the defendant's conduct." Hull, 149 N.H. at 713 (citation omitted). Because determining the defendant's awareness is a subjective inquiry, it may be proved by any surrounding facts and circumstances from which such awareness may be inferred. Id.

Viewing the evidence and the reasonable inferences therefrom in the light most favorable to the State, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the defendant behaved recklessly. The jury heard evidence that the victim habitually urinated and defecated on herself. A rational trier of fact reasonably could have inferred that the defendant was aware of this fact. Moreover, the evidence was manifest that the defendant knew that the victim had fallen to the floor. In addition, there was evidence that, although it was February, the victim wore only a wet, thin nightgown without underclothing. There was also evidence that only four feet from where the victim lay, there was a hole in the floor of her mobile home. Further, there was evidence that, on the fourth day after the fall, the defendant and her daughter, concerned that the victim was still on the floor, searched the internet for information about symptoms of strokes and other ailments, and yet the defendant decided not to call for help until the next day. There was also

10

evidence that, had the victim simply sat in her chair for five days, she would not have developed an ulcer.

There was also evidence, when viewed in the light most favorable to the State, that the defendant had a motive for consciously disregarding the substantial and unjustifiable risk that the victim would sustain serious bodily injury if left on the floor, in February, lying in her own waste, wearing only a wet, soiled, thin nightgown and no underclothing. The defendant stood to benefit from the victim's death because, as the parties stipulated, she was one of two beneficiaries of the victim's annuity account and IRA. There was also evidence that the defendant had, on multiple occasions, told the victim that she could not wait for her to die so that the defendant could have her money.

Further bolstering the State's mens rea evidence was evidence that, when viewed in the light most favorable to the State, demonstrated that the defendant was conscious of her guilt. The jury heard evidence that while the victim was in the hospital, the defendant called the hospital and screamed at a nurse that she was not to blame for the victim's condition. The jury also heard evidence that, although the defendant twice claimed that a social worker had visited the victim's home and told the defendant that she had to allow the victim to remain on the floor, in fact, no social service agency worker had visited the home while the victim was on the floor. There was evidence, as well, that the defendant told a hospital nurse that the victim had not soiled herself at home, but rather did so en route to the hospital. See State v. Evans, 150 N.H. 416, 420 (2003) (explaining that "[i]t is reasonable to infer consciousness of guilt from a defendant's false exculpatory statement because an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish . . . her innocence" (quotation and brackets omitted)).

From all of the evidence, viewed in the light most favorable to the State, a rational trier of fact could have found, beyond a reasonable doubt, that the defendant was aware of, but consciously disregarded, a substantial and unjustifiable risk that leaving the elderly victim on the floor for five days in her own waste in the middle of February, dressed only in a wet, thin nightgown and no underclothing, without calling for help, would result in serious bodily injury to her, and that a law-abiding citizen would not have waited so long to call for help.

The defendant contends that the evidence of her recklessness was insufficient because there was no evidence that she had ever heard of necrotizing fasciitis. Nor, she argues, was there evidence that she was specifically aware that the victim's skin could have broken down because of the pressure of the floor and because her skin was perpetually wet from urinating on herself. However, to be sufficient, the evidence did not have to establish that the defendant "anticipated the precise risk or injury that resulted." Hull,

11

149 N.H. at 713. Here, the evidence was sufficient to establish that the defendant was aware that there was something wrong with the victim; on the fourth day after the fall, the defendant searched the internet for explanations as to why the victim remained on the floor after four days. The evidence was also sufficient to establish that, despite her concern, the defendant deliberately chose to wait until the fifth day after the fall to call for a "lift assist."

The defendant also contends that the State was required and failed to prove that she was reckless as to the victim's competence. She argues that the victim's "competence mattered because her long-established and well-documented determination to refuse medical care, in conjunction with her right, while competent, to refuse care, rendered pointless any effort to seek treatment while she was competent." However, as previously discussed, the jury was not compelled to find that any call for help before the fifth day would have been futile. Moreover, the issue was whether the defendant was reckless because she failed to call for help to get the victim off the floor, not whether she was reckless because she failed to obtain medical care for the victim.

### 2. Sufficiency of the Evidence: Negligent Homicide

To convict the defendant of negligent homicide, the State had to prove, beyond a reasonable doubt, that she caused the victim's death negligently. See RSA 630:3, I. The defendant argues that the evidence was insufficient to prove both elements of the crime — that she acted negligently and that her negligence caused the victim's death. As to causation, the defendant merely reiterates the causation arguments she makes as to the criminal neglect of an elderly adult charge. We reject her arguments regarding the sufficiency of the evidence that her negligence caused the victim's death for the same reasons that we rejected her arguments regarding the sufficiency of the evidence that her criminal neglect caused the victim to sustain serious bodily injury. Accordingly, we focus upon the defendant's assertion that the evidence that she acted negligently was insufficient.

To establish that the defendant acted negligently, the State had to prove that she failed "to become aware of a substantial and unjustifiable risk that the material element exists or will result from [her] conduct." RSA 626:2, II(d) (2016). "The risk must be of such a nature and degree that [her] failure to become aware of it constitutes a gross deviation from the conduct that a reasonable person would observe in the situation." Id. "A person charged with criminal negligence may not be convicted on evidence that establishes only ordinary negligence." Dion, 164 N.H. at 548 (quotation and brackets omitted). Rather, "[t]he carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong." Id. at 548-49 (quotation and ellipsis omitted). Thus, "criminal negligence requires not only the failure to perceive a more than

12

ordinary risk, but also some serious blameworthiness in the conduct that caused it." Id. at 549 (quotation and brackets omitted). We use an objective test to determine whether the defendant failed to become aware of a substantial and unjustifiable risk. State v. Shepard, 158 N.H. 743, 746 (2009).

Thus, as the defendant explains in her brief, the difference between recklessness, which was necessary to prove that she was guilty of criminal neglect of an elderly adult, and negligence, is that to prove recklessness, the State had to prove that she actually was aware of a substantial and unjustifiable risk, whereas to prove negligence, the State had only to prove that a reasonable person would have been aware of that risk.

We hold that, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the State, the evidence was sufficient for a rational trier of fact to find, beyond a reasonable doubt, that a reasonable person would have been aware that there was a substantial and unjustifiable risk of death in allowing an elderly, morbidly obese woman, who routinely urinated and defecated on herself, to remain on the floor in her own waste for multiple days dressed only in a thin, wet nightgown and no underclothing in February. A reasonable person would have been aware that the victim had been unable to lift herself from the floor on day one and that she could not have been lifted off the floor without help from emergency responders. A reasonable person would also have been aware that allowing the victim to remain on the floor for five days would not result in the victim suddenly being able to lift herself off the floor. A reasonable person would know that there was a substantial and unjustifiable risk that the victim would become hypothermic by lying on the floor in only a thin, wet nightgown, given that it was mid-February and there was a hole in the floor only feet from where she lay. A reasonable person would know that hypothermia can be fatal. A reasonable person would also know that lying in one position can cause sores, that contact with fecal matter can cause infection, and that infections in the elderly can be fatal. We agree with the State that "[c]ertainly, by the fourth day when the defendant became concerned that [the victim] had suffered a stroke, a reasonable person would have been aware that further delay in seeking assistance created a substantial and unjustifiable risk of death."

The defendant also contends that the State was required and failed to prove that she was negligent as to the victim's competence. Similarly to her argument with respect to the criminal neglect of an elderly adult charge, the defendant asserts that the victim's "long-established and oft-repeated determination to refuse medical care, in conjunction with her legal right, while competent, to refuse such care, rendered pointless any effort to seek treatment while she was competent." However, as previously discussed, the jury was not compelled to find that any call for help before the fifth day would have been futile.

13

### 3. Sufficiency of the Evidence: Failure to Report

To convict the defendant of failing to report elder abuse, the State had to prove that she: (1) suspected or believed in good faith that the victim, an incapacitated adult, had been subjected to abuse, neglect, self-neglect, or was living in hazardous conditions; and (2) knowingly failed to immediately make the required report to adult protective services. See RSA 161-F:46, :50. An adult is "incapacitated" within the meaning of the statute if her "physical, mental, or emotional ability . . . is such that [she] is unable to manage personal, home or financial affairs in [her] own best interest, or . . . is unable to delegate responsibility to a responsible caretaker or caregiver." RSA 161-F:43, VII (2014) (amended 2016). "Self-neglect" refers to "an act or omission by an incapacitated adult which results or could result in the deprivation of essential services or supports necessary to maintain his or her minimum mental, emotional or physical health and safety." RSA 161-F:43, VI (2014) (amended 2016).

The defendant argues that the evidence was insufficient to prove that she acted "knowingly." A "person acts knowingly with respect to conduct or to a circumstance that is a material element of an offense when he is aware that his conduct is of such nature or that such circumstances exist." RSA 626:2, II(b) (2016). Knowledge "as to whether conduct constitutes an offense or as to the existence or meaning of the law defining the offense" is not an element of such offense, "unless the law so provides." RSA 626:2, V (2016).

The defendant argues that the evidence was insufficient because there was no evidence that she knew of any change of circumstances that would have changed the analysis of state social workers who, before the victim fell in February 2016, had investigated her circumstances and determined that they could not force her to accept services. However, to convict the defendant of knowingly failing to report elder abuse, the State did not have to prove that she knew of such a change of circumstances. In other words, to obtain a conviction, the State did not have to prove, beyond a reasonable doubt, that any report to adult protective services would have had a particular result; the State had to prove only that the defendant knowingly failed to immediately report her suspicion or good faith belief that the victim was incapacitated and had been subject to abuse, neglect, self-neglect, exploitation, or was living in hazardous conditions. See RSA 161-F:46.

Here, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the State, a rational trier of fact could find, beyond a reasonable doubt, that the defendant suspected or had a good faith belief that the victim was "incapacitated" in that she could not manage her affairs on her own. See RSA 161-F:43, VII. There was evidence that the defendant and her daughter moved in with the victim precisely because the victim could not

14

manage her own affairs. Additionally, there was evidence that, after the victim fell, the defendant knew that the victim could not lift herself off the floor.

A rational trier of fact, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the State, could also find, beyond a reasonable doubt, that the defendant suspected or had a good faith belief that the victim engaged in self-neglect and lived in hazardous conditions. See RSA 161-F:43, VI. There was evidence from which a rational trier of fact could have reasonably inferred that the defendant was aware that the victim had fallen to the floor, that although she was on the floor, she continued to urinate and defecate on herself, and that she lay on the floor in her own waste. See id.

Further, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the State, a rational trier of fact could have reasonably inferred that the defendant knowingly failed to report that the victim had fallen to the floor and was lying there in her own waste. Although the defendant claimed that a social worker had visited the victim's home and told the defendant that she had to allow the victim to remain on the floor, there was no evidence that a social service agency worker had visited the home while the victim was on the floor. Nor was there any evidence that the victim's fall had been reported to adult protective services before emergency responders reported such on February 17, 2016.

### B. Jury Instruction Error

We next consider the defendant's assertion that her conviction on the criminal neglect of an elderly adult charge must be reversed under our plain error rule because the trial court erroneously instructed the jury as to one of the elements of that offense. The trial court instructed the jury: "So for this offense, the State must prove [that] . . . the Defendant was unable to provide care to an elderly person through no fault of her own, despite a good faith effort by the Defendant to provide such care." (Emphasis added.) The court's instruction was based upon RSA 631:8, VI, which provides, in pertinent part: "Nothing in this section shall be construed to impose criminal liability on a person who has made a good faith effort to provide for the care of an elderly . . . adult, but through no fault of his or her own, has been unable to provide such care . . . ." Assuming without deciding that the State bears the burden of proof on this element, had the trial court correctly instructed the jury, it would have told the jury that the State had to prove either that the defendant was able to provide care to the victim or that she was unable to do so and that her inability was her own fault. Id.

The State concedes that the trial court's instruction was erroneous and that the error was plain, but asserts that reversal is not required. We agree with the State that reversal is not required. Even if we assume without

deciding that the first three prongs of the plain error test are met, the fourth prong is not.  The fourth prong of the plain error test requires us to "decide whether the trial court's error seriously affects the fairness, integrity or public reputation of judicial proceedings."  Russell, 159 N.H. at 491 (quotation and brackets omitted).  In Russell, we held that the trial court's failure to instruct the jury that it must unanimously conclude that the deadly weapon used by the defendant during the charged robbery was a firearm did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings" because "the evidence presented at trial that the defendant used a firearm to commit the charged offense was overwhelming."  Id. at 490, 491, 492 (quotation omitted); see also State v. Ortiz, 162 N.H. 585, 591, 592 (2011) (trial court did not "commit[] plain error by instructing the jury that the mens rea for the [charged offense] was 'knowingly' instead of 'purposely'" where "the evidence that the defendant acted purposely was overwhelming and essentially uncontroverted").

Here, there was no evidence that the defendant was unable to call the fire department for help sooner than the fifth day after the victim fell.  Indeed, the evidence was overwhelming that the defendant could have called for help earlier, but simply chose not to do so.  Accordingly, we find no basis for concluding that the trial court's allegedly erroneous jury instruction seriously affected the fairness, integrity, or public reputation of judicial proceedings.  See Russell, 159 N.H. at 491-92.

Affirmed.

LYNN, C.J., and BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

16